**Carver Dan PEAVY, Plaintiff,**

v.

**NEW TIMES, INC. and Peter Elkind, Defendants.**

**No. CA 3–96–0547–R.**

United States District Court,
N.D. Texas,
Dallas Division.

Aug. 18, 1997.

Arthur Floyd Selander, Michael J. Quilling, Keith Brian Cummiskey, Kenneth Arthur Hill, Quilling, Selander, Cummiskey, Clutts & Lownds, Dallas, TX, James M. Morris, Kennedy, Minshew, Campbell & Morris, Sherman, TX, for Plaintiff.

Charles L. Babcock, David Charles Myers, Jackson Walker, LLP, Dallas, TX, for Defendants.

## MEMORANDUM OPINION

BUCHMEYER, Chief Judge.

This case presents a question of first impression concerning the constitutionality of the federal wiretap statute, 18 U.S.C. § 2510 (Title III), as applied to the following facts: an unknown person illegally wiretapped private telephone conversations in which the plaintiff, a public school board trustee, made numerous racial slurs and profane comments, such as:

> ...And anybody that would go out there to *these schools and take these mother fucking ignorant god-damn little niggers* and everything else *and all these chicken-shit parents* for forty five thousand a year, *you've got to kiss my fucking ass.*

Audio tapes of these wiretapped conversations were delivered by the anonymous recorder to two African American school district trustees, one Hispanic trustee, and one white trustee. A written transcript of the entire tape was read into the minutes of a public meeting of the school board by the two black trustees. The defendants, a weekly newspaper and its editor—who obtained a copy of these minutes through an open records request made on the day following the board meeting[1]—published the complete

---

1. Tex Gov't Code Ann., Chs. 551 and 552.

transcript, including all of the profanity and racist diatribe.

■ This opinion holds that, for the reasons discussed below, the federal wiretap statute cannot be constitutionally applied to prohibit the newspaper and its editor from publishing the transcript of a telephone conversation which was read at the public school board meeting, even assuming that they knew the conversation had been illegally recorded by some unknown person.

## I. FACTUAL BACKGROUND

The newspaper article which occasioned this suit (the "Article") appeared in the October 5–11, 1995 edition of the *Dallas Observer,* which is published weekly by Defendant New Times. The Article consisted of the full transcript (the "Transcript") of the recorded telephone conversations between the plaintiff Carver Dan Peavy ("Peavy") and perhaps three unidentified persons,[2] and an editor's note by defendant Peter Elkind, the *Dallas Observer* editor. At the time of the taping, Peavy had been serving as a trustee for the Dallas Independent School District ("DISD") for over seven years.

Audio tapes of the intercepted telephone conversation were anonymously delivered to at least three DISD trustees on Thursday, September 28, 1995, the date of a regularly scheduled school board meeting—*a meeting which Peavy did not attend.* In the meeting's open session, trustees Yvonne Ewell and Kathlyn Gilliam read the Transcript in its entirety into the official record. The contents were then published verbatim in the Transcript of the meeting, and thus were available to the general public under state law.[3]

During the conversations recorded in the audio tape (the "Tape") and the Transcript,

Peavy used a plethora of racial epithets and delivered a barrage of profanity. For example, after beginning with Peavy's comment that "I have never witnessed dealing with *as many ignorant mother fucking niggers,*" the Tape and the Transcript included the following:

". . . There is no wonder why we are running the way we are running. You know, _____ has promoted this, *these dammed niggers . . . .*"

". . . The boy is fucking slow. Then you've got all of his underlings which are slower . . . I just got rid of him over at Business where *he fucked up so bad we had to outsource the mother fucker* to get out of all the penalties that the State was putting on us. We had millions of dollars worth of fines that we were fixing to force ourselves on, until we outsourced that with another crew, *and got some white folks working on it.*"

"He don't need to put himself in bed with man folk. *Like all those niggers you know he hired . . . .* Well, . . . we need to talk to some of those Blacks."[4]

"You see, we don't have a school board. *You've got Yvonne and Kathlyn that are . . . all they're talking about is nigger rights . . . .*"

The "Yvonne" and "Kathleen" named by Peavy in the last quotation are African American school board trustees Yvonne Ewell and Kathlyn Gilliam.[5] In other profane comments, Peavy referred by name to five other trustees,[6] six DISD employees and teachers, the then DISD Superintendent Chad Woolery, and four candidates running for election for the school board.[7]

---

**2.** Peavy claims the tapes, of private conversations he made from his home, were recorded without his consent. The dates the recordings took place is not established by the summary judgment record.

**3.** Tex Gov't Code Ann., Chs. 551 and 552.

**4.** This was the only time in the Transcript that Peavy used the word "Black," instead of "nigger."

**5.** Also referring to Yvonne Ewell, Peavy state: "I can't stand her ass. I can tell she's an asshole because I know how she treats me. She just kisses my ass."

**6.** Peavy referred to a white school board member as "just like tits off (sic) a warthog."

**7.** According to Peavy's recorded comments, one of these board candidates was "a fucking queer."

*the first day's publicity*

Following this school board September 28, 1995 meeting, there was an immediate public condemnation of Peavy and his conduct. The next day (Friday, September 29, 1995), the Tape and the Transcript were the subject of a front page article in the *Dallas Morning News,* and at least four different news broadcasts on Dallas television. The *Dallas News* story—captioned *"Racial slurs on tape linked to DISD Trustee. Peavy's resignation is urged; lawyer questions authenticity "*—contained the following:

> On the five-minute tape, which The News listened to late Thursday,[8] the man identified as Mr. Peavy frequently uses racial epithets. He is quoted as saying schools are difficult to manage because they contain *"ignorant goddamn little niggers and everything else and all these chicken-shit parents."*

In another section, the man refers to other trustees, including some of Mr. Peavy's allies, with sexist, anti-gay and other derogatory terms.

    ***           \

The transcript came from a tape sent to at least three board members ... late Wednesday at their school district offices. The anonymous package had the return address of 3700 Ross Ave., the district's administration headquarters.

The tape was accompanied by an unsigned, typed note that said: *"These are parts of a conversation that I had with Dan Peavy, DISD board member. Is this the kind of person we need on the board?"*

This September 28, 1995 *Dallas News* article also explained that the Tape and the Transcript appear to contain "fragments of seven conversations," and that "most appear to involve Mr. Peavy and one other person; one involved at least three other people." Even though this article began with *"Editor's note: This story contains offensive language,"* the only such language is that contained in the first paragraph of the quotation indented above.[9]

Peter Elkind, the *Observer* editor, learned from the September 29 *Dallas Morning News* article that Peavy "had made certain remarks which had been transcribed and read into the record at the public school board meeting" on the previous day. He immediately telephoned the DISD public information office and made a request, under the Texas Open Records Act, for a copy of the Transcript. That same day, a clerical employee of the *Observer* went to the DISD headquarters, picked up the Transcript, and delivered it to Elkind.[10] This was about five days before the next weekly publication of the *Dallas Observer,* the October 5–11, 1995 edition.[11]

*the second day of publicity*

Another article about the Tape and the Transcript appeared in the *Dallas Morning News* on Saturday, September 30, 1995. Captioned *"Peavy offers apology for racial slurs,"* this story did not contain any of Peavy's profanity and racist remarks,[12] but only stated:

> On the five-minute tape, Mr. Peavy uses a racial slur six times, makes other disparaging remarks about blacks, and utters more than two dozen expletives. He also uses sexist and anti-gay epithets in referring to other board members.

However in the September 30 edition of *The New York Times,* an article about the Peavy Tape and Transcript ("Tensions Rise in Dallas After Racial Slurs by School Official") reprinted some of the profanity and racial slurs:

---

8. The article does not reveal how, or from whom, *The News* obtained the Tape (or the Transcript), nor does the summary judgment record contain this information.

9. I.e., "ignorant goddam little niggers and everything else and all these chicken-shit parents."

10. Neither Elkind or the *Dallas Observer* ever obtained a copy of the Tape.

11. Normally, this edition of the *Observer* would have reached some downtown paper racks on Wednesday, October 4, 1995.

12. This *Dallas News* article began: "An ashen Dan Peavy apologized to the Dallas Independent School District on Friday for using 'colorful language' and said a tape peppered with racial slurs was an attempt to smear him."

The tape from which the transcript was made was a recording of several telephone conversations between Mr. Peavy and an unidentified caller. In the transcript, Mr. Peavy appears to discuss school board business in language filled with obscenities and *references to several people as "nigger."*

The transcript begins with Mr. Peavy talking about *ignorant "niggers,"* and few paragraphs later, it quotes Mr. Peavy saying that a school district employee had mishandled a project and that, as a result, the board *"got some white folks working on it."*

At other points, Mr. Peavy describes schools as filled with *ignorant "little niggers"* and maligns his fellow board members, referring to one as *"that cow."*

### the Dallas Observer publicity

A few days after the *Dallas Morning New* article (September 29) and *The New York Times* story (September 30)—which printed only a few examples of the Peavy profanity and racial slurs—the *Dallas Observer* printed the entire Transcript (deleting only several of the names of DISD employees) in its weekly editions dated October 5–11, 1995. This article began with the following title and with Elkind's editor's note:

**WHAT PEAVY ACTUALLY SAID** Media reports of a DISD trustee's comments offended an entire city. His exact words are even worse.

*Editor's note: What follows is the full three-page transcript of comments by Dallas school trustee Dan Peavy—remarks that have scandalized the city, even though few people have had the opportunity to actually read them in unadulterated form. The transcript, released at a DISD board meeting on Thursday, September 28, was produced by a DISD administrative aid from a tape recording anonymously sent to three school trustees. Peavy, who has acknowledged making the comments—and tearfully apologized for them—says the tape was spliced together from a number of conversations that were recorded without his knowledge. Though there are frequent gaps in the transcript, the Observer has made no changes, other than to delete the names and other identifying details of several people whom Peavy mentions, and correct obvious spelling or punctuation errors on the transcript.* [13]

### the other October 4 publicity

In the Wednesday, October 4, 1995 edition of the *Dallas Morning News,* an expurgated version of the tape was printed in Steve Blow's popular column in the Metropolitan Section, with this introduction:

**Peavy's tape transcript is loud and clear**

I had wanted to judge his comments for myself. And I thought you might, too. So here's the transcript of the secretly recorded phone calls with Dallas school board member Dan Peavy. I have condensed it some and taken out individual names.

And as for the vulgarities and slurs, you'll have to use your imagination. Think crude.

Also on October 4, some of the profanity and racial slurs were printed in Associated Press Online ("little niggers" and "that cow").

### Peavy resigns and sues the Observer

On October 5, 1995, after repeated and vehement calls for his resignation, Peavy voluntarily relinquished his position as a DISD trustee. Subsequently, Peavy filed this suit in state court against defendants Elkind and the *Dallas Observer,* [14] asserting four claims: common law invasion of privacy and violations of three statutes—Texas Civil Practice and Remedies Code, § 123.002(2), Tex.Code Crim.Proc. Art. 18.20 § 16, and 18 U.S.C. § 2510 *et seq.* Defendants removed the case to this Court and immediately filed a motion for summary judgment with respect to all four claims. By amended pleading, Peavy abandoned his claims under common law and the Texas statutes. Thus, Peavy's sole remaining cause of action is based on the feder-

---

**13.** The entire *Dallas Observer* story is attached to this opinion as "Appendix A."

**14.** None of the other publications or writers who reported this incident have been sued by Peavy.

al wiretap statute, 18 U.S.C. § 2510 (Title III).

For the reasons discussed below, the Motion for Summary Judgment of the defendants New Times (*Dallas Observer*) and Elkind is **GRANTED,** and Peavy's Motion for Partial Summary Judgment seeking statutory damages of $10,000 under the federal wiretap statute is **DENIED.**

## II. LEGAL ANALYSIS

### A. *Summary Judgment Standard*

Rule 56(c) of the Federal Rules of Civil Procedure allows summary judgment only where there is no genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law.[15] All reasonable doubts and inferences must be decided in the light most favorable to the party opposing the motion .[16] Indeed, as long as there appears to be some evidentiary support for the disputed allegations, the motion must be denied.[17]

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.[18] Where the non-moving party bears the burden of proof on a claim upon which summary judgment is sought, the moving party may discharge its summary judgment burden by showing that there is an absence of evidence to support the nonmoving party's case.[19] Once the moving party has satisfied its burden, the nonmoving party must go beyond the pleadings and—by its own affidavits or by depositions, answers to interrogatories, and admissions on file—set forth specific facts showing a genuine issue for trial.[20] Summary judgment will be granted against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." [21]

### B. *The Federal Wiretap Statute: 18 U.S.C. § 2510 (Title III)*

Peavy contends that by publishing the Transcript allegedly knowing that it had been obtained through the illegal interception of a telephone call, Defendants violated the federal wiretap statute, or Title III, 18 U.S.C. § 2510 *et seq.*, which provides, in relevant part, a remedy against one who:

> (c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; [or]

> (d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection.[22]

In response, the Defendants challenge the constitutionality of the federal wiretap act as applied to their conduct in this case.

Because a finding of liability under Title III would have the effect of sanctioning the newspaper and its editor for the publication of truthful information of public import, the application of this statute must be viewed in light of the ever-present tension between the right which the First Amendment accords to

15. FED.R.CIV P. 56(c) (1994).

16. *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 640 (5th Cir.1985).

17. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Coke v. Gen. Adjustment Bureau*, 640 F.2d 584, 595 (5th Cir.1981) (en banc).

18. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

19. *Id.* at 325, 106 S.Ct. at 2553–54.

20. *Id.* at 324, 106 S.Ct. at 2553; *Anderson v. Liberty Lobby Inc.*, 477 U.S. at 256, 106 S.Ct. at 2514.

21. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

22. 18 U.S.C. § 2511((1)(c) and (d).

a free press, on the one hand, and the protections accorded to personal privacy via federal and state statutes, on the other hand. In this case, the tension arose from a newspaper's publication of transcripts of private telephone conversations allegedly in violation of the federal wiretap statute. Although the free speech/privacy tension is a subject addressed several times in recent years by the United States Supreme Court, never has a federal court been forced to specifically examine the constitutionality of Title III.[23] While the Supreme Court's treatment of the clash between First Amendment protections and privacy rights is not by any means exhaustive, its decisions have "without exception upheld the press' right to publish. . . ."[24]

Rather than attempting to articulate a broad holding regarding the constitutionality of the statute at issue, this Court will follow the Supreme Court's lead, "relying on limited principles that sweep no more broadly than the appropriate context of the instant case."[25] It is therefore appropriate to focus on the narrow "interface between press and privacy that this case presents,"[26] namely, whether Congress may impose sanctions on the accurate publication of transcripts of a telephone conversation obtained from public records—more specifically, from school board minutes open to public inspection. In short, each case involves an examination of the specific publication at issue and the policy underlying that statute purporting to prohibit such publication.

■ The guiding principle articulated in *Smith v. Daily Mail Publishing Co.*, which is used to address attempts to punish truthful publication, is this: "if a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order."[27] Relevant to this inquiry are three considerations: (1) whether the newspaper " '*lawfully* obtain[ed] *truthful* information about a matter of public significance;' "[28] (2) whether imposing liability on the defendant serves a "need to further a state interest of the highest order;"[29] and (3) whether allowing the media to be punished for publishing the information would result in "timidity and self-censorship."[30]

Applied to the instant case, these considerations clearly command summary judgment in favor of the media defendants. First, while the original tape may have been obtained illegally, it is undisputed that Elkind obtained the tape transcripts lawfully from school board records, open to the public. It is also without question that elected official Peavy's racist views on how a district, heavily populated with minorities, should be run is a matter of public concern to the citizens of Dallas.

The Act's stated purpose is twofold: (1) to protect the privacy of wire and oral communications; and (2) to delineate on a uniform basis the circumstances and conditions under which the interception of wire and oral com-

---

**23.** In fact, there appears to be only one state court that has considered this problem. In New York, a state trial court imposed liability on a media defendant under Title III for publication of information lawfully obtained. *Natoli v. Sullivan*, 159 Misc.2d 681, 606 N.Y.S.2d 504 (N.Y.Sup.1993), aff'd, 206 A.D.2d 841, 616 N.Y.S.2d 318 (1994). However, this New York case is a lone holding which offers no controlling precedent. Moreover, the information disclosed from illegal wiretaps in *Natoli* was purely private, with no public interest served by their revelation. Finally, the opinion was in response to a motion to dismiss which involved a very different standard than that applicable here. Thus, this Court does not view the *Natoli* decision as persuasive.

**24.** *Florida Star v. B.J.F.*, 491 U.S. 524, 530, 109 S.Ct. 2603, 2607, 105 L.Ed.2d 443 (1989).

**25.** *Id.* at 533, 109 S.Ct. at 2609.

**26.** *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 491, 95 S.Ct. 1029, 1044, 43 L.Ed.2d 328 (1975).

**27.** 443 U.S. 97, 103, 99 S.Ct. 2667, 2671, 61 L.Ed.2d 399 (1979).

**28.** *Florida Star*, 491 U.S. at 536, 109 S.Ct. at 2610 (quoting *Daily Mail*, 443 U.S. at 103, 99 S.Ct. at 2670–71).

**29.** *Id.* at 537, 109 S.Ct. at 2611.

**30.** *Id.* at 535, 109 S.Ct. at 2610 (citing *Cox Broadcasting*, 420 U.S. at 496, 95 S.Ct. at 1046–47).

munications may be authorized.[31] The Supreme Court, while never having addressed specifically the constitutionality of Title III, has provided some guidance as to what is (or more commonly, what is not) an overwhelming state interest. In *Daily Mail*, the Supreme Court held that the state interest in protecting the anonymity of a juvenile offender was not substantial to permit the state to punish the publication of the offender's name, lawfully obtained.[32] In *Florida Star*, the court held that a statute under which a newspaper was punished for publishing the identity of a rape victim did not serve a "state interest of the highest order."[33] Finally, in *Landmark Communications, Inc. v. Virginia*, the Supreme Court concluded that the state interests in prohibiting publication of confidential proceedings before a judicial conduct review committee was not sufficiently substantial enough to justify the encroachment on First Amendment guarantees.[34] Certainly, in light of these precedents, the interest in protecting the statutory privacy rights of Peavy, an elected official, is not compelling enough to warrant infringement on the constitutional rights of the Defendants to publish matters of paramount public import. While the privacy interest at stake here is less than compelling, the public interest in the publication of these transcripts, on the other hand, is great. The *Cox Broadcasting* court observed that:

> in a society in which each individual has but limited time and resources with which to observe at first hand the operations of his government, he relies necessarily upon the press to bring to him in convenient form the facts of those operations. Great responsibility is accordingly placed upon the news media to report fully and accu-

rately the proceedings of government, and official records and documents open to the public are the basic data of governmental operations. Without the information provided by the press most of us and many of our representatives would be unable to vote intelligently or to register opinions on the administration of government generally.[35]

The school board meeting embodies the spirit of local government. The public's interest in open government begins at this, the local level. It is in this arena that citizen participation arguably has the greatest impact. Such participation would not be possible in the absence of the accurate reporting of the proceeding. Public records are, by their very nature, "of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media. The freedom of the press to publish that information appears to be of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business."[36]

Indeed, this would not be the first time the privacy rights of a public figure were forced to bow to the First Amendment rights of the media. For example, in defamation cases, where, like here, the protected interest is in personal reputation, the prevailing view is that truth is a defense.[37] Moreover, the Supreme Court has held that public officials cannot recover against the media even for publication of false information absent a showing of actual malice.[38] Even *private* individuals cannot hold a publisher of false information liable for defamation without showing fault.[39] This rationale applied to

**31.** Omnibus Crime Control and Safe Streets Act of 1968 Report, S.Rep. No. 1097, 90 th Cong., 2 nd Sess. 88 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2153.

**32.** 443 U.S. 97, 99 S.Ct. 2667, 61 L.Ed.2d 399.

**33.** 491 U.S. 524, 109 S.Ct. 2603, 105 L.Ed.2d 443 (applying *Daily Mail* rule).

**34.** 435 U.S. 829, 839, 98 S.Ct. 1535, 1541–42, 56 L.Ed.2d 1 (1978).

**35.** *Cox Broadcasting, Corp.*, 420 U.S. at 491–92, 95 S.Ct. at 1044.

**36.** *Id.* at 495, 95 S.Ct. at 1046.

**37.** *See New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Garrison v. Louisiana*, 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964).

**38.** *Id.* at 279–80, 84 S.Ct. at 725–26; *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 334, 94 S.Ct. 2997, 3004, 41 L.Ed.2d 789 (1974).

**39.** *Id.*

Title III would prohibit imposition of liability on Defendants in the instant case because the information published was accurate and Defendants did not illegally obtain the Transcript.

This Court recognizes that the interest in privacy fades where the information involved already appears on the public record.[40] "By placing the information in the public domain on official [school board] records, the State must be presumed to have concluded that the public interest was thereby being served."[41] Elkind obtained the tape transcripts from the minutes of the school board meeting. The transcript was made available by a governmental body pursuant to a statute regulating the dissemination of public information. Also, the meeting at which the transcript was read in full and extensively discussed was a public meeting. Under these circumstances, the line of United Supreme Court cases culminating in *Florida Star* precludes liability as a matter of constitutional law.

The Supreme Court has specifically expressed reluctance "to embark on a course that would make public records generally available to the media but forbid their publication if offensive to sensibilities of the supposed reasonable man."[42] Imposing liability on the media in the instant case would mandate self-censorship as a predicate to news release. Such liability would create an undue procedural and economical burden on the media. For instance, a newspaper could not report whether a school board voted to construct a new school based on reports in the minutes alone. Instead, a representative of the newspaper would have to personally attend the meeting (if open to public), rely on copious notes, and perhaps even interview trustees to ensure that the vote accurately reflected their views. It is irrational to believe that such requirements are necessary to further accurate journalism. Here, Elkind justifiably relied on the Transcript made available by a governmental entity in a public record when publishing the Article.

■ Once true information is disclosed in public school board documents open by law to public inspection, the press cannot be sanctioned for publishing that information. Any other conclusion would fly in the face of the First Amendment, which will not "allow exposing the press to liability for truthfully publishing information released to the public in official . . . records"[43]

## III. CONCLUSION

Accordingly, Defendants' Motion for Summary Judgment is granted because liability cannot be constitutionally imposed under Title III of the federal wiretap statute, 18 U.S.C. § 2511, on media defendants who obtain and publish truthful information taken from a transcript of a public school board meeting, even though the media defendants may have known that this public information had been illegally obtained by someone else. For the same reason, Plaintiff's Motion for Partial Summary Judgment is denied.

**40.** *Cox Broadcasting, Corp.,* 420 U.S. 494–95, 95 S.Ct. at 1045–46.

**41.** *Id.*

**42.** *Id.* at 496, 95 S.Ct. at 1046–47.

**43.** *Id.*

APPENDIX A

# What Peavy actually said

### Media reports of a DISD trustee's comments offended an entire city. His exact words are even worse

*Editor's note: What follows is the full three-page transcript of comments by Dallas school trustee Dan Peavy—remarks that have scandalized the city, even though few people have had the opportunity to actually read them in unadulterated form. The transcript, released at a DISD board meeting on Thursday, September 28, was produced by a DISD administrative aide from a tape recording anonymously sent to three school trustees. Peavy, who has acknowledged making the comments—and tearfully apologized for them—says the tape was spliced together from a number of conversations that were recorded without his knowledge. Though there are frequent gaps in the transcript, the Observer has made no changes, other than to delete the names and other identifying details of several people whom Peavy mentions, and correct obvious spelling or punctuation errors on the transcript.*

**Peavy:** I have never witnessed dealing with as many ignorant mother fucking niggers. . **Other:** .... .... .... ... ...

**Peavy:** .. that I am having to deal with when I go to these fucked-up meetings. There is no wonder why we are running the way we are nning. You know, [name deleted] has pro-.toted this, these damned niggers this this [name] ah [name]—

**Other:** Yes, and he's stupid.

**Peavy:** Who is he?

**Other 1:** I don't know

**Other 2:** Hell if I know.

**Other 3:** He's slow. And [name], do you know him?

**Other 1:** I know [name].

**Other 2:** [Name] is worse than [name].

**Peavy:** He's slow, boy. The boy is fucking slow. Then you've got all of his underlings, which are slower. And then you've got [name] that's been promoted to [position]. I just got rid of him over at [name of department] where he fucked up so bad we had to outsource the mother fucker to get out of all the penalties that the state was putting on us. We had millions of dollars worth of fines that we were fixing to force ourselves on, until we out-sourced that with another crew, and got some white folks working on it.

*Interruption in tape*

**Peavy:** First thing we are going to do is go in there and get legal to fire [name]. Then we need to go fire [black assistant superinten dent] Shirley Ison-Newsome.

**Other:** Well, I see, she, ah, for some reason I don't know why they are linked so close Man, I can't, I.

**Peavy:** He don't need to put himself in bed with man folk. Like all those niggers you know he hired.

**Other:** Yeah.

**Peavy:** Well, we may have to, we need to talk to some of those blacks.

**Other:** Oh, I know it, I'm serious, but, Dan -y're all so goddamned.. Say you only get d of ..who in the hell ..

**Peavy:** that guy from New York

*Interruption in tape*

**Peavy:** Hello (Pause). Oh, fuck you. (Pause)

Some nigger!

*Interruption in tape*

**Peavy:** Anybody...you know. I know how much money I can make here freelancing, OK. and settling a deal here and there and doing what I want to do and not having to take anybody's shit and everything. And anybody that would go over here to one of these schools and take these mother fucking ignorant goddamned little niggers and everything else and all these chicken shit parents for $45,000 a year, you've got to kiss my fucking ass I wouldn't take one of these fucking schools for 45,000 dollars, there's no way

**Other:** I know, I hear you

*Interruption in tape*

**Peavy:** Mother fucking [DISD trustee Bill] Keever on something...He's fucking through one item..

**Other:** ...anything, Dan...He can't do anything He's just a fucking kid.

**Peavy:** He's a child. He's a fucking child. You see that's the problem. You see we don't have a school board. You've got [trustees] Yvonne [Ewell] and Kathlyn [Gilliam] that are...all they're talking about is nigger rights, and you've got Hollis [Brashear] who can't vote until he talks to them. And you've got Rene Castilla, who, his only issue is getting back at [school board president Sandy] Kress.

**Other:** Is he going to run again?

**Peavy:** No. No, Guillermo Galindo, Robert Madrano [presumably Medrano], and Kathleen Leos are running. I been on the phone on that deal tonight, trying to convince them to support this white gal; but they're not going to do it. They are going to gō with Guillermo Galindo and he's very negative and we don't want him. We don't want him worth a shit. And then in this other race we got the fucking queer, and I don't know what he's, what his deal is. And then you have fucking Linda Mcfucking Dow, who is just like tits off a warthog; and Bill Keever. So that's the deal. And then you have Sandy Kress and I.

**Other:** ...son-of-a-bitch.

**Peavy:** I will guarantee, let me put it on the line. If it weren't for Sandy and I, the whole fucking thing, you would lose it all to the press and Woolery wouldn't be, he wouldn't have a job now. Whether he deserves the job or doesn't deserve it, I'm telling you, the boy wouldn't have one. He has no PR skills whatsoever And Kress is just leading him around everywhere and then they try to show his effectiveness....blind.

*Interruption in tape*

**Other:** Ms. Ewell is sure behind the Newsome.

**Peavy:** I believe she's the most....I...want to say she's an asshole, I know that. I can't stand her ass. I can tell that she's [an] asshole because I know how she treats me. She just kisses my ass.

**Other:** She does the same thing to Sandy, right? If I were pissed off she would ask what it's about.

**Peavy:** I could go in there and wear the ugliest fucking tie I've got, and know it's ugly, she'd still....black mother fucker in a god-damned lot, and then put it on, knowing it's the ugliest one I got [and] that cow would say "Mr. Peavy, that sure is a beautiful tie you have on today." That's what that cow would say.

*Interruption in tape*

**Peavy:** ...white boy ..I never really liked the fucking nigger, and I won't now; not like Sandy Kress. I won't.....He's an ignorant mother fucker .. .He's weak. .he even makes a nice picture Until he opens his mouth, until he says something, then you know he is a fucking amateur You know, I lay you odds, that question by question, without any practice, I could answer it better for the press and for the TV than he does. Right now, no practice or anything, you just ask me the questions 🔟