Carver Dan PEAVY, et al., Plaintiffs,

v.

Charles James HARMAN, Sr.,
et al., Defendants.

Carver Dan Peavy, et al., Plaintiffs,

v.

WFAA–TV, Inc., et al., Defendants.

Nos. Civ.A. 3:96CV1506–
R, 3:96–CV–2945–R.

United States District Court,
N.D. Texas,
Dallas Division.

Feb. 18, 1999.

500

In Civil Action No. 3:96–CV–1506–R, the parties' motions for summary judgment are **GRANTED IN PART AND DENIED IN PART.** Defendants' are entitled to judgment as a matter of law on Plaintiffs' common law claims for public disclosure of private facts, intentional infliction of emotional distress, tortious interference with contractual relations, and civil conspiracy. Plaintiffs are entitled to judgment as a matter of law on their claims against the Harmans for violations of 18 U.S.C. § 2510 ("Title III"), the Texas Wiretap Act, Tex. Civ.Prac. & Rem.Code Ann. § 123.001, and for invasion of privacy by intrusion. This action will proceed to trial on the issue of damages and whether the Defendants intentionally disclosed the contents of the "Race Tape" in violation of Title III and the Texas Wiretap Act.

In Civil Action No. 3:96–CV–2945–R, Defendants' Motion for Summary Judgment is **GRANTED,** and Plaintiffs' Motion for Summary Judgment is **DENIED.** All claims against the Defendants are dismissed with prejudice.

It is so **ORDERED.**

### FINAL JUDGMENT

For the reasons stated in the Findings and Recommendation of the United States Magistrate Judge and this Court's Order adopting the Findings and Recommendation as the Findings and Conclusions of this Court, and pursuant to Rule 58 of the Federal Rules of Civil Procedure,

**IT IS HEREBY ORDERED** that judgment be entered in favor of Defendants. All claims of Plaintiffs against Defendants are hereby **DISMISSED WITH PREJUDICE.** Costs are awarded to Defendants.

It is so **ORDERED.**

### FINDINGS AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

KAPLAN, United States Magistrate Judge.

These cases have been consolidated for pretrial purposes and are before the Court

Michael J. Quilling, Quilling Selander Cummiskey Clutts & Lownds, Dallas, Texas, for plaintiffs.

Frank H. Jackson, Law Office of Frank Jackson, Dallas, Texas, for defendants.

Thomas S. Leatherbury, William D. Sims, Vinson & Elkins, Dallas, TX, for WFAA–TV and Robert Riggs.

### ORDER

BUCHMEYER, Chief Judge.

This Court has made an independent review of the Findings and Recommendation ("Findings and Recommendation") of the United States Magistrate Judge, rendered on October 15, 1998, as well as the Objections to the Findings and Recommendation, and the relevant portions of pleadings, files, and records in this case. The Court concludes that the Findings and Recommendation of the Magistrate Judge are correct and they are adopted as the Findings and Conclusions of this Court.

on cross-motions for summary judgment. The motions have been referred to United States Magistrate Judge Jeff Kaplan for recommendation pursuant to 28 U.S.C. § 636(b).

## I.

### *BACKGROUND*

This case started with the breakdown of common civility between neighbors. It led to a public scandal that resulted in a highly publicized criminal trial and spawned at least thirteen different civil lawsuits.[1] The facts are relatively simple and straightforward. Succinctly stated, plaintiffs got caught with their hands in the "cookie jar" and are upset that the media exposed their misdeeds. However, this case also presents a unique opportunity to further define the parameters of the federal wiretap statute. This legal issue is at the heart of the pending summary judgment motions.

The saga began in December 1994 when Charles Harman purchased a police scanner to monitor criminal activity in his neighborhood. The first time Harman used the scanner he intercepted a signal from a cordless telephone being used by his next-door neighbor, Dan Peavy. Harman overheard Peavy talking to another neighbor about filing a class-action lawsuit against him and his wife.[2] This piqued Harman's interest and he continued to monitor Peavy's phone calls. Later that same day, Harman heard Peavy tell an unidentified party "how much money [he] was making off the insurance policies at DISD." (WFAA Exh. M at 168). Harman thought this conversation was significant since Peavy was a trustee of the Dallas Independent School District.

Harman consulted the scanner manual to determine whether it was legal to tape the intercepted phone calls. The manual suggested that any such inquiries be directed to local law enforcement authorities. Harman decided to contact the Dallas County District Attorney's office. He spoke to Assistant District Attorney Bill Geyer and asked if it was legal to listen to the cordless telephone conversations. Geyer responded, "Absolutely." (C. Harman Aff. ¶ 8). Harman then inquired whether he could record the telephone calls. Geyer said, "Go ahead. Anything over the air is free." (C. Harman Aff. ¶ 8). Based on these assurances, Harman began to make the infamous "Peavy tapes."

Peavy continued to plot with his neighbors against Harman. On one occasion, Peavy offered to put up "$10,000 to make sure [a lawsuit] was filed." (C. Harman Aff. ¶ 9). Harman perceived this statement as a threat against his family. He reported this conversation to Geyer who referred him to the Dallas Police Department. Harman spoke with several police

---

1. *Dan Peavy v. New Times, Inc.*, No. 3–96–CV–0547–R (N.D.Tex., filed February 26, 1996); *Dan Peavy, et al. v. Charles Harman, et al.*, No. 96–CV–1506–BD (N.D.Tex., filed May 28, 1996); *Dan Peavy, et al. v. WFAA–TV, et al.*, No. 96–CV–2945–R (N.D.Tex., filed October 25, 1996); *Eugene Oliver, et al. v. WFAA–TV, et al.*, No. 3–96–CV–3436–L (N.D.Tex., filed December 30, 1996); *Dan Peavy v. Dallas Independent School District, et al.*, No. 97–CV–2163–L (N.D.Tex., filed September 3, 1997); *Amy Peavy v. Charles Harman*, No. 3–97–CV–2685–BD (N.D.Tex., filed November 3, 1997); *Houston Goodspeed v. Charles Harman*, No. 3–97–CV–2681–BD (N.D.Tex., filed November 3, 1997); *Sue Kendrick v. Charles Harman*, No. 3–97–CV–2682–BD (N.D.Tex., filed November 3, 1997); *John Kendrick v. Charles Harman*, No. 3–97–CV–2683–BD (N.D.Tex., filed November 3, 1997); *Virginia Moore v. Charles Harman*, No. 3–97–CV–2686–BD (N.D.Tex., filed November 3, 1997); *Don Timberlake v. Charles Harman*, No. 3–97–CV–2684–BD (N.D.Tex., filed November 3, 1997); *Dave Richardson v. Charles Harman*, No. 3–97–CV–2739–BD (N.D.Tex., filed November 7, 1997); *James Stephenson v. Charles Harman*, No. 3–97–CV–2740–BD (N.D.Tex., filed November 7, 1997);

2. Peavy and Harman have been involved in a number of petty disputes over the years. On one occasion, Peavy sued Harman because he refused to cut back vegetation on his property that obstructed Peavy's view of a lake. More recently, Harman complained to code enforcement officials after Peavy installed high intensity security lights around his house.

officers but was not satisfied with their response. He then called District Attorney John Vance. Harman told Vance about the threats against his family and possible improprieties related to DISD insurance. Vance agreed to meet with Harman after the first of the year.[3] Until then, he instructed Harman to "keep taping." (C. Harman Aff. ¶ 16). Harman believed that he was getting the "run around" from the authorities. His frustrations eventually led him to contact the media.

Harman called WFAA–TV on December 8, 1994. He spoke to P.J. Ward, a field producer and former director of a consumer hot-line known as "Contact 8." Harman said that he had information concerning possible corruption of an unnamed public official. Ward questioned Harman about his allegations and determined that the official was Dan Peavy.[4] The information was passed on to senior reporter Robert Riggs for further investigation. Riggs called Harman later that day. Harman said he had proof that Peavy had threatened to harm him and was involved in an insurance kickback scheme. However, he only wanted to discuss these matters in person at his home.

Riggs met with Harman and his wife on December 9, 1994. Harman played portions of a tape recorded conversation between Peavy and another party wherein they discussed a plan to split commissions on cancer insurance sold to Mary Kay Cosmetics. Riggs was stunned to hear these remarks from a public official. Harman indicated that he planned to record future telephone calls and asked Riggs if he wanted copies of the tapes. Riggs said that he did. However, he instructed Harman to leave the recorder running throughout the entire conversation and not to edit the tapes so their authenticity could not be questioned. Riggs also asked Harman whether it was legal to record these conversations. Harman assured him that his actions had been approved by the Dallas County District Attorney and the Dallas Police Department.

Riggs returned to the television station and played portions of the tape for Ward and News Director John Miller. All agreed that there was credible evidence of public corruption that should be investigated. However, they first contacted their attorney to determine whether it was legal to use the tape recordings. Paul Watler told Miller that he could accept and broadcast the tapes. This advice was confirmed in a written legal memorandum dated January 4, 1995.

Thereafter, Harman provided WFAA with 18 tapes containing 188 telephone conversations between Peavy and others. Ward listened to the tapes, took notes, and attempted to transcribe the conversations. However, some of the tapes were of poor quality and difficult to understand. Ward selected relevant portions of the tapes and had them transcribed by a professional court reporter. Copies of the transcripts were furnished to Riggs, Miller, and Watler in February 1995.

Several weeks later, Riggs was informed by a law enforcement source about a recent amendment to the federal wiretap statute. Riggs contacted Watler to determine whether the interception of cordless telephone calls was prohibited under the new law. Watler researched the issue and learned that an October 1994 amendment made it unlawful to intercept the radio portion of a cordless telephone call. He immediately advised WFAA not to accept any additional tapes from Harman, not to broadcast the tapes already in its possession, and not to confront individuals about

---

3. Vance met with Harman on January 17, 1995. Also present were Assistant District Attorney Mike Gillett and Investigator Bob Jennings. Harman states that all the participants reassured him that his actions were legal.

4. Ward was already familiar with Peavy through previous complaints about his home construction business.

conversations on the tapes. Riggs returned the original tapes to Harman on or about March 1, 1995. Copies of the tapes and all related documents were delivered to Watler for safekeeping.

Harman also learned that it was illegal to tape these telephone conversations. FBI Agent Mark Chapman met with Harman on March 14, 1995 and showed him a copy of the new law. Harman mistakenly believed that he could still listen to the phone calls as long as he did not tell law enforcement officials what he heard. Nevertheless, Harman recorded at least one other conversation. He pled guilty to federal wiretap violations and paid a $5,000 fine in connection with this recording.

Meanwhile, WFAA continued to investigate Peavy. Riggs learned that Peavy had been appointed by the president of the school board to solicit new bids on group term life and disability insurance for DISD employees. Peavy designated Eugene Oliver as the exclusive insurance agent to obtain these bids. The contracts were ultimately awarded to two companies represented by Oliver. Thereafter, Oliver split his commissions with Peavy and several others. Riggs also uncovered a similar arrangement between Peavy and Oliver involving a cancer insurance policy that Oliver was negotiating with Mary Kay Cosmetics.

The relationship between Peavy and Oliver was the subject of a three-part series broadcast by WFAA in the summer of 1995. Riggs did not mention or play any of the tapes he received from Harman during the broadcasts. On July 31, 1995, DISD Superintendent Chad Woolery announced an investigation into the school district's insurance program. Peavy was ultimately stripped of his authority over insurance procurement, and DISD stopped paying agent commissions on insurance contracts. The FBI conducted a parallel criminal investigation during the same time period. As a result of this investigation, Peavy and Oliver were indicted on more than forty counts of official bribery, conspiracy, and income tax evasion. They were eventually acquitted of all charges.

On September 28, 1995, audiotapes of Peavy's telephone conversations were anonymously distributed to at least three DISD board members. In those conversations, Peavy used extremely offensive racial epithets, profanity, and derogatory remarks to describe minority students and school district personnel.[5] A written transcript of the tape was prepared and read into the record at a regularly scheduled meeting of the Dallas school board. Peavy resigned from the board a short time later.

The Peavys and Olivers have now filed three separate lawsuits against the Harmans, WFAA, and Robert Riggs.[6] Plaintiffs allege that defendants intercepted, used, and disclosed their private telephone conversations in violation of the federal and state wiretap statutes. Plaintiffs also assert common law claims for invasion of privacy, intentional infliction of emotional distress, tortious interference with contractual relations, and civil conspiracy. Defendants have answered and raised several affirmative defenses. All parties move for summary judgment on their claims and defenses. The legal issues have been fully briefed by the parties and this matter is ripe for determination.

## II.

### SUMMARY JUDGMENT STANDARD

Summary judgment is proper when there is no genuine issue as to any materi-

---

5. The contents of this tape are described at length in *Peavy v. New Times, Inc.*, 976 F.Supp. 532, 534–35 (N.D.Tex.1997). A detailed recitation of these highly offensive remarks is neither necessary nor appropriate to the disposition of the pending motions.

6. The Peavys sued the Harmans on May 28, 1996. They filed a separate action against WFAA and Riggs on October 25, 1996. The Olivers sued the Harmans, WFAA, and Riggs on December 30, 1996. All three lawsuits arise out of the same facts and have been consolidated for pretrial purposes.

al fact and the movant is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A dispute is "genuine" if the issue could be resolved in favor of either party. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Thurman v. Sears, Roebuck & Co.,* 952 F.2d 128, 131 (5th Cir.), *cert. denied,* 506 U.S. 845, 113 S.Ct. 136, 121 L.Ed.2d 89 (1992). A fact is "material" if it might reasonably affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Matter of Gleasman,* 933 F.2d 1277, 1281 (5th Cir.1991).

This case is before the Court on cross-motions for summary judgment.[7] Consequently, each party has the burden of producing evidence to support its motion. *Dutmer v. City of San Antonio,* 937 F.Supp. 587, 589–90 (W.D.Tex.1996). The movant has the initial burden of showing the absence of a genuine fact issue. *Tubacex, Inc. v. M/V Risan,* 45 F.3d 951, 954 (5th Cir.1995). The burden then shifts to the non-movant to show that summary judgment is not proper. *Duckett v. City of Cedar Park,* 950 F.2d 272, 276 (5th Cir. 1992). Either party may satisfy its evidentiary burden by tendering depositions, affidavits, and other competent summary judgment evidence. *Topalian v. Ehrman,* 954 F.2d 1125, 1131 (5th Cir.), *cert. denied,* 506 U.S. 825, 113 S.Ct. 82, 121 L.Ed.2d 46

(1992). All evidence must be viewed in the light most favorable to the party opposing the motion. *Rosado v. Deters,* 5 F.3d 119, 122 (5th Cir.1993). However, conclusory statements and testimony based on conjecture or subjective belief are not competent summary judgment evidence. *Topalian,* 954 F.2d at 1131.

### III.

### *TITLE III—HISTORICAL OVERVIEW*

The resolution of this case depends largely on the interpretation of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended by the Electronic Communications Privacy Act of 1986, 18 U.S.C. § 2510, *et seq.* ("Title III").[8] Title III imposes criminal and civil liability upon any person who:

(a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;

\*　　\*　　\*　　\*　　\*　　\*

(c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection; [or]

(d) intentionally uses, or endeavors to use, the contents of any wire, oral, or

---

7. A case may not be appropriate for summary disposition even if the parties have filed cross-motions for summary judgment. *See, e.g. Bricklayers, Masons and Plasterers International Union of America v. Stuart Plastering Co.,* 512 F.2d 1017, 1023 (5th Cir.1975); *Dutmer,* 937 F.Supp. at 589. The Court must still examine the record to determine whether there are genuine issues of material fact for trial. *John v. State of Louisiana Board of Trustees for State Colleges and Universities,* 757 F.2d 698, 705 (5th Cir.1985); *Schlytter v. Baker,* 580 F.2d 848, 849 (5th Cir.1978).

8. Plaintiffs also assert claims under the Texas Wiretap Act, TEX.CIV.PRAC. & REM.CODE ANN.

§ 123.001, *et seq.* (Vernon 1986). The statute provides, in pertinent part:

A party to a communication may sue a person who:
(1) intercepts, attempts to intercept, or employs or obtains another to intercept or attempt to intercept a communication; [or]
(2) uses or divulges information that he knows or reasonably should know was obtained by interception of the communication.

*Id.* § 123.002(a)(1)–(2). The Texas statute does not contain an intent element and differs from the federal statute only in that limited respect.

electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection...

18 U.S.C. § 2511(1). The statute also provides for the suppression of any evidence obtained by use of an illegal wiretap:

> Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.

*Id.* § 2515; *see also id.* § 2518(10)(a)(i).

Title III was intended to broadly ban the use of wiretaps and any evidence derived therefrom. The decision to create such extensive remedies can be traced to the historical shortcomings of the federal wiretap laws. Before the enactment of Title III, wiretapping was prohibited by the Federal Communications Act of 1934, 47 U.S.C. § 605. However, the statute applied only to federal law enforcement agents. Private parties were free to employ wiretaps with impunity. *See* Note, *Should "Clean Hands" Protect the Government Against § 2515 Suppression Under Title III of the Omnibus Crime Control and Safe Streets Act of 1968?*, 53 WASH. & LEE.L.REV. 1473, 1476 & nn. 13–15 (1996), *citing* 1 J. GARR, THE LAW OF ELECTRONIC SURVEILLANCE § 2.1 (2d ed.1986). In 1967, the Supreme Court addressed the constitutional implications of wiretap activities when it held that the use of electronic surveillance by law enforcement officials could violate the constitutional right of pri-

vacy under the Fourth Amendment.[9] *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Berger v. New York*, 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967).

Title III was enacted to correct deficiencies in the existing law and address the concerns expressed in *Berger* and *Katz.* The statute has two purposes: (1) to protect the privacy of wire and oral communications; and (2) to delineate on a uniform basis the circumstances and conditions under which the interception of wire and oral communications may be authorized. S.Rep. No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 2112, 2153. The legislative history clearly indicates that Congress intended a broad ban on the use of electronic surveillance to adequately protect privacy interests:

> It is not enough, however, just to prohibit the unjustifiable interception, disclosure, or use of any wire or oral communications.... All too often the invasion of privacy itself will go unknown. Only by striking at all aspects of the problem can privacy be adequately protected. The prohibition, too, must be enforced with all appropriate sanctions. Criminal penalties have their part to play. But other remedies must be afforded the victim of an unlawful invasion of privacy. Provision must be made for civil recourse for damages.

*Id.* at 2156. At the same time, Title III specifically delineates a narrow set of circumstances under which law enforcement authorities can obtain valid wiretaps and use wiretap information. *See* 18 U.S.C. §§ 2516–2519.

Title III originally covered only wire and oral communications. However, the rapidly growing number of non-wire tech-

---

**9.** *Katz* and *Berger* effectively overruled *Olmstead v. United States*, 277 U.S. 438, 48 S.Ct. 564, 72 L.Ed. 944 (1928). *Olmstead* was often cited for the proposition that wiretapping did not violate the Fourth Amendment because it involved neither a physical intrusion nor the seizure of tangible property. However, *Katz* recognized that "the underpinnings of *Olmstead* ... have been so eroded by our subsequent decisions that the 'trespass' doctrine there enunciated can no longer be regarded as controlling." *Katz*, 88 S.Ct. at 512.

nologies such as e-mail, cellular phones, paging devices, and computer-to-computer data transmissions eventually rendered the statute "hopelessly out of date." S.Rep. No. 541, 99th Cong., 2d Sess., *reprinted in* 1986 U.S.C.C.A.N. 3555, 3556, 3562–65. Congress responded with the Electronic Communications Privacy Act of 1986. However, this legislation specifically exempted "the radio portion of a cordless telephone communication transmitted between the cordless handset and the base unit" from the protections of Title III. *Id.* at 3566, 3568. Congress reasoned that "[b]ecause communications made on some cordless telephones can be intercepted easily with readily available technologies, such as an AM radio, it would be inappropriate to make the interception of such a communication a criminal offense." *Id.* at 3566.

Congress revisited the issue in 1994. It found that " '[t]he cordless phone, far from being a novelty item used only at 'poolside,' has become ubiquitous ... More and more communications are being carried out by people [using cordless phones] in private, in their homes and offices, with an expectation that such calls are just like any other phone call.' " H.Rep. No. 827, 103d Cong., 2d Sess., *reprinted in* 1994 U.S.C.C.A.N. 3489, 3497. Accordingly, Title III was amended to bring cordless telephones within the protections of the statute. *Id.* at 3498, 3510. This amendment became effective on October 25, 1994, just five weeks before Harman purchased his police scanner and began to record Peavy's telephone calls.

## IV.

### *EVIDENTIARY ISSUES*

■ Plaintiffs have filed a motion to suppress most of the summary judgment evidence submitted by defendants. They argue that this evidence was obtained in violation of the federal wiretap statute and must be excluded under 18 U.S.C. § 2515. Each party also has objected to portions of various affidavits and depositions excerpts. The Court will address these evidentiary issues at the outset.

### A. *Motion to Suppress*

An aggrieved person may file a motion to suppress the contents of a wire or oral communication intercepted in violation of Title III and any evidence derived therefrom. *See* 18 U.S.C. §§ 2515 & 2518(10)(a). An "aggrieved person" is one who was a party to an intercepted communication or against whom the interception was directed. *Id.* § 2510(11); *United States v. Scasino*, 513 F.2d 47, 49 (5th Cir.1975). The "contents" of a communication subject to suppression "include any information concerning the substance, purport, or meaning of" the communication. 18 U.S.C. § 2510(8).

Plaintiffs clearly have standing to file a motion to suppress. However, their attempt to preclude any use of the tapes in this summary judgment proceeding "puts the cart before the horse." [10] The Court must first find a Title III violation *before* the exclusionary rule is applicable. *See id.* § 2518(10)(a)(i).

Moreover, both parties must rely on the tapes to prove their claims and affirmative defenses. Plaintiffs cannot establish a cause of action under the federal wiretap statute unless they compare the contents of the tapes with the contents of any alleged uses or disclosures. [11] The media defendants need the tapes to prove that the issues discussed therein involve matters of public significance, a key element of their First Amendment defense. Finally,

**10.** Plaintiffs rely on *Gelbard v. United States*, 408 U.S. 41, 92 S.Ct. 2357, 33 L.Ed.2d 179 (1972). However, the *Gelbard* court assumed that the wiretaps at issue violated Title III. *Gelbard*, 92 S.Ct. at 2360. This Court is unable to make such an assumption.

**11.** Plaintiffs recognize that they need this evidence to establish their cause of action and have submitted transcripts of four tapes in support of their motion for summary judgment. (Plf.Exh. A–1).

the necessity defense raised by Harman directly implicates the contents of the tapes. The Court concludes that defendants may use the tapes to defend themselves against the claims made the basis of this suit. *See McQuade v. Michael Gassner Mechanical & Electrical Contractors, Inc.*, 587 F.Supp. 1183, 1190–91 (D.Conn. 1984) ("Section 2515 was no more designed to keep defendants in lawsuits brought under § 2520 from defending the alleged violations of § 2511 than it was to keep the [g]overnment from prosecuting violators under § 2511.").

An "adjudicatory exception" to Title III is not without precedent. It is well settled that the government may use and disclose illegally intercepted information to investigate and prosecute a criminal defendant charged with violating the wiretap laws. *See Chandler v. United States Army*, 125 F.3d 1296, 1302 n. 2 (9th Cir.1997); *Forsyth v. Barr*, 19 F.3d 1527, 1544 (5th Cir.), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994); *United States v. Underhill*, 813 F.2d 105, 112 (6th Cir.), *cert. denied*, 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376, *and cert. denied*, 483 U.S. 1022, 107 S.Ct. 3268, 97 L.Ed.2d 766, *and cert. denied*, 484 U.S. 846, 108 S.Ct. 141, 98 L.Ed.2d 98, *and cert. denied*, 484 U.S. 821, 108 S.Ct. 81, 98 L.Ed.2d 43 (1987); *United States v. Liddy*, 354 F.Supp. 217, 221 (D.D.C.1973), *aff'd*, 509 F.2d 428 (D.C.Cir. 1974), *cert. denied*, 420 U.S. 911, 95 S.Ct. 833, 42 L.Ed.2d 842 (1975). Other federal courts have extended this exception to civil cases. *Williams v. Poulos*, 11 F.3d 271, 286 (1st Cir.1993); *McQuade*, 587 F.Supp. at 1188. This Court now follows suit. The motion to suppress should be denied.

### B. *Objections*

The parties also raise numerous objections to each other's summary judgment evidence.[12] Much of this evidence is unnecessary to the disposition of the pending motions and will not be considered. This renders most of the objections moot.

However, the Court has found it necessary to rely on certain portions of the affidavits and deposition testimony of Charles Harman, Wilma Harman, Robert Riggs, P.J. Ward, and Paul Watler. (C. Harman Aff. ¶¶ 8–10, 12, 13, 16, 19, 25, 27, 32; C. Harman Dep. at pp. 62–63, 73, 82, 107, 129, 168–76, 184; W. Harman Aff. ¶¶ 5–7, 9, 10, 13, 15, 17; W. Harman Dep. at pp. 45, 49, 56; WFAA Exh. D ¶¶ 5, 6, 7–10, 13, 24, 39, 40; WFAA Exh. E ¶¶ 7, 9, 17, 18; WFAA Exh. F ¶¶ 6, 24). Plaintiffs object to this evidence on hearsay grounds. The Court finds that the statements go to the state of mind of the defendants and thus fall within a well-recognized exception to the hearsay rule. Fed.R.Evid. 803(3); *see also United States v. Williams*, 993 F.2d 451, 457 (5th Cir.1993). Accordingly, these objections should be overruled.

### V.

### *LIABILITY UNDER TITLE III*

Plaintiffs allege that the Harmans intercepted, used, and disclosed their private telephone conversations in violation of Title III. They further contend that the media defendants illegally procured the interceptions and used and disclosed the contents of the tapes. All defendants argue that they lacked the requisite intent to violate the statute. Moreover, the media defendants deny any use or disclosure of the communications. The Court will consider these arguments in turn.

### A. *Intent*

Title III prohibits the intentional interception of wire, oral, or electronic communications. 18 U.S.C. § 2511(1)(a). It also prohibits the intentional use or disclosure of such communications if the defendant knows or has reason to know that the communication was intercepted in violation of the statute. *Id.* § 2511(c) & (d). Defendants argue that all their actions were informed by the opinions of law enforce-

---

12. Some of plaintiffs' objections mirror the arguments raised in their motion to suppress.

These objections should be overruled for the reasons stated in Part IV–A of this opinion.

ment authorities or the advice of counsel. They reason that this negates any intent to violate the law.

The federal wiretap statute contains two different mental state requirements depending on the type of violation alleged. The Court will examine each one separately.

### 1.

Title III imposes liability upon any person who "intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a). The Harmans contend that this subsection requires proof of a specific intent to violate the law. Their argument goes something like this. Title III creates a civil remedy for the violation of a criminal statute. As a result, plaintiffs should be required to prove criminal intent in order to establish their cause of action. *Mens rea*, or "evil mind," is an essential part of criminal intent. It therefore follows that good faith reliance on the advice of law enforcement officials negates such intent.

■ The premise of this argument is fundamentally flawed. The mere fact that Title III provides a civil remedy for the violation of a criminal statute does not mean that a defendant is entitled to criminal protections. Congress may impose both criminal and civil liability for the same conduct. *United States v. Ward*, 448 U.S. 242, 250, 100 S.Ct. 2636, 2642, 65 L.Ed.2d 742 (1980); *Helvering v. Mitchell*, 303 U.S. 391, 399, 58 S.Ct. 630, 633, 82 L.Ed. 917 (1938). Whether a particular penalty is civil or criminal is a matter of statutory construction and involves a two-part test. The first question is whether Congress expressly or implicitly denominated the penalty as civil or criminal. *United States v. One Assortment of 89 Firearms*, 465 U.S. 354, 364, 104 S.Ct. 1099, 1106, 79 L.Ed.2d 361, 368 (1984); *Ward*, 100 S.Ct. at 2641. If Congress intended to establish a civil penalty, the

Court must then determine whether "the statutory scheme [is] so punitive either in purpose or effect as to negate that intention." *Ward*, 100 S.Ct. at 2641.

■ The first prong of the test is easily satisfied. Title III contains a remedial provision that expressly authorizes the recovery of civil damages. 18 U.S.C. § 2520. However, this does not end the inquiry. The Court must still determine whether the civil damages provision creates a criminal punishment despite the expressed intentions of Congress. In making this determination, the Court must consider whether the civil penalty: (1) involves an affirmative disability or restraint; (2) has historically been regarded as punishment; (3) requires proof of scienter; (4) promotes the traditional aims of punishment; (5) applies to behavior that is already a crime; (6) is rationally related to an alternative purpose; and (7) is excessive in relation to the alternative purpose assigned. *See Hudson v. United States*, 522 U.S. 93, 118 S.Ct. 488, 493, 139 L.Ed.2d 450 (1997), *citing Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963). "Only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Ward*, 100 S.Ct. at 2641–42.

■ Consideration of these factors compels the conclusion that the remedial aspects of Title III do not constitute a criminal penalty. The first two factors weigh heavily in favor of this result. The civil damages provision does not involve an "affirmative restraint" such as imprisonment. *See Grossfeld v. Commodity Futures Trading Commission*, 137 F.3d 1300, 1303 (11th Cir.1998). Instead, it provides for monetary damages. This type of relief has not historically been regarded as punishment. *Hudson*, 118 S.Ct. at 496. The third factor—whether scienter is an element of a civil violation—begs the question and cannot be considered. The fourth factor requires an assessment of whether the

civil penalty promotes the traditional aims of criminal punishment. The primary goal of the civil statute is to compensate victims of illegal wiretap activities. Although the threat of a large damage award may also promote deterrence, this is not outcome determinative. *Id.* The sixth and seventh factors implicate any alternative purpose for the law. Title III was intended to broadly protect the right to privacy. 1968 U.S.C.C.A.N. at 2156. Penalizing those who intrude on this right is rationally related to a legitimate non-punitive purpose. Moreover, the civil penalty is limited to actual damages sustained by the victim or statutory damages based on the duration of the violation. 18 U.S.C. § 2520(b) & (c)(2). The remedial provision of Title III is not excessive in relation to the alternative purpose of the statute. *See Grossfeld,* 137 F.3d at 1303 & n. 7 (penalty provision allowing agency to tie amount of penalty to gravity of violation not excessive on its face). The Court recognizes that the civil statute applies to behavior that is already a crime. However, this fact alone is insufficient to transform an expressly civil penalty into a criminal sanction. *Hudson,* 118 S.Ct. at 496; *see also Ward,* 100 S.Ct. at 2641–42.

Title III does nothing more than create a tort-like remedy for the violation of a criminal statute. Intentional torts typically require proof that the actor desires the consequences of his act or reasonably believes that such consequences are likely to result from his conduct. RESTATEMENT (SECOND) OF TORTS § 8A (1965). Whether the Harmans knew their actions were illegal is irrelevant.

■ The Court would reach the same conclusion even if criminal intent were an essential element of a civil action under Title III. Criminal intent can be either specific or general. Only a specific intent crime requires proof of an intent to violate the law. A general intent crime merely requires proof of intent to engage in conduct that violates the law, knowing that the consequences are substantially certain to result. *See United States v. Reese,* 2 F.3d 870, 880–81 (9th Cir.1993), *cert. denied,* 510 U.S. 1094, 114 S.Ct. 928, 127 L.Ed.2d 220 (1994), *citing Screws v. United States,* 325 U.S. 91, 96, 104, 65 S.Ct. 1031, 1033, 1037, 89 L.Ed. 1495 (1945). The issue thus becomes whether a violation of Title III is a specific or general intent crime.

■■ The Court concludes that a criminal violation of the federal wiretap statute only requires proof of general intent. Title III prohibits the "intentional" interception of protected communications. 18 U.S.C. § 2511(1)(a). Use of the term "intent" in a criminal statute is usually indicative of a general intent crime. *See, e.g. United States v. Baker,* 807 F.2d 427, 428–29 (5th Cir.1986) (criminal statute that requires act to be committed "intentionally" and "knowingly" does not require proof that defendant knew his action violated the law). By contrast, use of the term "willful" to describe a requisite mental state requires proof of specific intent. *See Screws,* 65 S.Ct. at 1037; *see also United States v. Davis,* 132 F.3d 1092, 1094 (5th Cir.1998) (approving jury instruction defining "willfully" as meaning "that the act was committed voluntarily and purposely with the specific intent to do something the law forbids; that is to say, with bad purpose whether to disobey or disregard the law.").

■ Moreover, the law presumes that criminal statutes require only general intent "[i]n the absence of an explicit statement that a crime requires specific intent." *United States v. Hicks,* 980 F.2d 963, 974 (5th Cir.1992), *cert. denied,* 507 U.S. 998, 113 S.Ct. 1618, 123 L.Ed.2d 178, *and cert. denied,* 508 U.S. 941, 113 S.Ct. 2417, 124 L.Ed.2d 640 (1993). This presumption is particularly relevant in light of a 1986 amendment to the federal wiretap statute. Section 2511(1) originally required proof of a "willful" violation. However, Congress amended the statute to prohibit the "intentional" interception of a wire, oral, or elec-

tronic communications. *See* 18 U.S.C. § 2511(1). The legislative history indicates that this was done "to underscore that inadvertent interceptions are not crimes." 1986 U.S.C.C.A.N. at 3577. Subsequent judicial decisions make it clear that "intentional" under Title III means simply "not accidental." *See, e.g., Thompson v. Dulaney,* 970 F.2d 744, 748 (10th Cir.1992); *Ali v. Douglas Cable Communications,* 929 F.Supp. 1362, 1376 (D.Kan. 1996). *See also United States v. Savage,* 564 F.2d 728, 732 (5th Cir.1977) (Title III did not cover contents of telephone call inadvertently intercepted by switchboard operator).

■ The summary judgment evidence conclusively establishes that the Harmans acted consciously, as opposed to accidentally, to bring about the consequences of their actions. They used a police scanner to intercept more than 188 private telephone conversations between Dan Peavy and others over a four month period. Only the first interception was truly inadvertent. The Court concludes that Harmans "intentionally" violated section 2511(1)(a), notwithstanding the assurances of law enforcement officials that their conduct was legal.

### 2.

■ Title III also prohibits the intentional "use" or "disclosure" of the contents of intercepted communications. 18 U.S.C. § 2511(1)(c) & (d). This implicates a slightly higher state of mind requirement.

In order to establish a violation under these subsections, plaintiffs must prove both intentional conduct *and* that defendants knew or had reason to know that the underlying interception was illegal. *See Forsyth,* 19 F.3d at 1538. Defendants argue they did not know or have reason to believe that the interceptions were illegal because they relied in good faith on the advice of law enforcement officials or legal counsel. At least one federal district court has recognized such a defense under the use and disclosure prongs of the wiretap statute. *See Kratz v. Kratz,* 477 F.Supp. 463, 483 (E.D.Pa.1979).[13]

■ This argument has some appeal. However, the Fifth Circuit implicitly rejected a good faith defense in *Forsyth.* The court noted that the knowledge requirement was satisfied if a defendant was aware of "sufficient facts concerning the circumstances of the interception such that he could, *with presumed knowledge of the law,* determine that the interception was prohibited in light of [Title III]." *Forsyth,* 19 F.3d at 1538 n. 21, *quoting Thompson,* 970 F.2d at 749 (emphasis added). Under this standard, plaintiffs are not required to prove that defendants had actual knowledge that their conduct was illegal. It is undisputed that all defendants knew: (1) the calls were coming from a cordless telephone; and (2) the conversations were being intercepted without the knowledge or consent of the participants. This makes the "use" or "disclosure" of those communications illegal under Title III.[14]

**13.** *Kratz* was a civil action brought under the federal wiretap statute. Defendant believed that his wife was having an extra-marital affair and asked his attorney whether he could place a wiretap on the family telephone. Counsel researched the applicable law and found a case from another jurisdiction that recognized an spousal immunity exception under Title III. *Kratz,* 477 F.Supp. at 466, *citing Simpson v. Simpson,* 490 F.2d 803 (5th Cir.), *cert. denied,* 419 U.S. 897, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974). However, counsel did not discover a more recent case from his own jurisdiction that rejected such an exception. *Id.* at 466 n. 4, *citing Remington v. Remington,* 393 F.Supp. 898 (E.D.Pa.1975).

The court refused to adopt the spousal exception but recognized a defense of "reasonable reliance upon a judicial interpretation of Title III." *Id.* at 484.

**14.** The media defendants cite *United States v. Schilleci,* 545 F.2d 519 (5th Cir.1977) for the proposition that the use and disclosure prongs of the wiretap statute require proof of specific intent. However, the defendant in that case was charged with conspiracy to intercept wire and oral communications. *Id.* at 521. Conspiracy is a specific intent crime. The Court has previously determined that a criminal violation of Title III only requires proof of general intent. *See* Part VII–A(1).

## B. *Interception and Procurement*

 Plaintiffs allege that the Harmans intercepted their private telephone conversations and the media defendants procured ·the interceptions.[15] *See* 18 U.S.C. § 2511(1)(a). Title III defines "interception" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." *Id.* § 2510(4). Charles Harman listened to private telephone conversations between Dan Peavy and others on his police scanner. Most of these conversations were recorded on audio tape. This clearly constitutes an interception under Title III.

The statute does not define the term "procure." Plaintiffs submit that one "procures" an interception when he "in some sort associate[s] himself with the venture, . . . participate[s] in it as in something that he wishes to bring about, [and] . . . seek[s] by his action to make it succeed." *Nye & Nissen v. United States,* 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919 (1949). This is the definition cited in the legislative history of the original wiretap statute. 1968 U.S.C.C.A.N. at 2181; *see also Kratz,* 477 F.Supp. at 476 n. 30. Defendants suggest that "procure" means to "actively bringing about, causing or instigating something to be done." *Flowers v. Tandy Corp.,* 773 F.2d 585, 590 (4th Cir.1985). Black's Law Dictionary contains a similar definition. BLACK'S LAW DICTIONARY 1208 (6th ed. 1990) ("To persuade, induce, prevail upon, or cause a person to do something. . . . Procure connotes action and means to cause, acquire, gain, get, obtain, bring about, cause to be done."); *see also Flowers,* 773 F.2d at 590.

 Despite superficial differences, both these definitions require some active participation on the part of the defendant. Other federal courts have interpreted the procurement prong of the statute "to ensnare not only the operative conducting an

illegal surveillance but the [person] who hired him as well." *United States v. Jones,* 542 F.2d 661, 670 n. 17 (6th Cir. 1976); *see also Jacobson v. Rose,* 592 F.2d 515, 517–18, 524 (9th Cir.1978), *cert. denied,* 442 U.S. 930, 99 S.Ct. 2861, 61 L.Ed.2d 298 (1979) (prosecutor who obtained illegal wiretap order held liable for procurement); *Kratz,* 477 F.Supp. at 466 & n. 30 (attorney actively participated in interception by telling his client to leave the wiretap in place to obtain further evidence). Thus, the mere fact that the media defendants may have associated with the Harmans and accepted tapes from them is not sufficient to constitute an illegal procurement under Title III.

Plaintiffs argue that the media defendants crossed the line into active participation by encouraging the Harmans to continue taping and showing them how to do it "better." However, the summary judgment evidence does not support this conclusion. Robert Riggs testified:

A: [Charles Harman] said that he was going to be recording and wanted to know if we wanted tapes. He had—he had explained in the lengthy discussion that we'd had with him before that he had contacted the police department, that he had discussed it with the district attorney's office and that they had advised him that it was legal to record and that he was going to be taping and we were—we were welcome to the tapes. And I said, 'Certainly, I would like to have copies.'

Q: Okay. Did you tell him anything about how to record?

A: Yes.

Q: What did you tell him?

A: I asked him not to edit conversations, that considering the serious nature of what he said he had heard before and what we heard on the tapes, don't edit the tapes. We don't—we do not

---

**15.** The media defendants did not intercept any communications and are not liable for merely listening to the tapes. *See United*

*States v. Turk,* 526 F.2d 654, 658 (5th Cir.), *cert. denied,* 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 84 (1976).

want an edited version or clips of conversations, that we want a full and complete record of the conversation so that no one could challenge the authenticity of the tape.

\* \* \* \* \* \*

A: Well, Mr. Harman asked us if we wanted—wanted copies of the tapes. He indicated that he was going to be taping, that he was extremely concerned for his safety, that his wife was concerned for their safety—

Q: Right.

A: —and said, 'You're welcome to have copies, I'll make you copies.

(Plf. Exh. H at 184–85, 255). No reasonable jury could find that this constitutes evidence of procurement. The Harmans clearly told Riggs that they intended to keep taping. There is no evidence that they would have abandoned this venture had Riggs not convinced them to continue. *Cf. Kratz,* 477 F.Supp. at 476 n. 30. In fact, Wilma Harman confirmed that Riggs did not encourage them:

Q: And [Riggs] talked to you about what you had heard and other conversations, I take it?

A: Right.

Q: Did he request that you do anything thereafter?

A: No.

Q: Did you tell him, 'Hey, we're going to keep listening; we're going to keep recording'?

A: I think we told him—yeah, we knew we would listen and that we would give him any tapes that we got.

(Plf. Exh. B at 22).

Riggs did tell the Harmans not to turn their tape recorder on and off in the middle of conversations. (Plf. Exh. A at 103). However, this does not constitute evidence of procurement. Riggs made this sugges-

tion to protect the integrity of the tape recordings. He was concerned that someone might question the authenticity of the tapes if portions of conversations were spliced together. Given that the Harmans had already told Riggs they intended to keep taping, his suggestion cannot reasonably be interpreted as active participation in the venture. The media defendants are not liable under section 2511(1)(a) as a matter of law.

### C. *Use*

 Title III also prohibits the intentional use of the contents of illegally intercepted communications. 18 U.S.C. § 2511(1)(d). The term "use" is not defined in the statute or legislative history. Black's Law Dictionary defines "use" as "to employ; to avail oneself of; to utilize, to carry out a purpose of action by means of; to put into action or service, especially to attain an end." BLACK'S LAW DICTIONARY 541. This definition connotes active employment of the contents of the illegally intercepted communication for some purpose. *See Fields v. Atchison, Topeka, and Santa Fe Railway Co.,* 985 F.Supp. 1308, 1314 (D.Kan.1997), *as amended,* 5 F.Supp.2d 1160 (D.Kan.1998). Thus, merely listening to tape recordings of illegally intercepted telephone calls does not constitute a use within the meaning of Title III. *Id.; see also Reynolds v. Spears,* 857 F.Supp. 1341, 1345 n. 5 (W.D.Ark. 1994), *aff'd,* 93 F.3d 428 (8th Cir.1996) (defendant did not use tapes by merely overhearing them). *But cf. Thompson v. Dulaney,* 838 F.Supp. 1535, 1547 (D.Utah 1993).[16] Plaintiffs' arguments to the contrary must be rejected.

 The media defendants further contend that copying and transcribing the tapes do not constitute uses because these actions merely aided them in listening to

---

**16.** The district court in *Thompson* was "not persuaded by the innovative argument that the term 'use,' as utilized in the statute, is an active, rather than a passive term." *Thompson,* 838 F.Supp. at 1547. However, the court cited no authority or rationale to support its conclusion. This Court does not find *Thompson* persuasive and declines to follow it.

the tapes. The Court agrees with this conclusion, but not its premise. The tapes were not copied because the media defendants wanted to passively listen to them. They were reproduced to aid in the further investigation of Peavy and Oliver. Still, plaintiffs must prove that defendants used the *contents* of the tapes in order to establish a Title III violation. *See* 18 U.S.C. § 2511(1)(d). The contents of an intercepted communication are not actively employed merely by copying or transcribing tapes. Stated differently, the "substance, purport, [and] meaning" of the communications are not "used" when the tapes are copied or transcribed. They are merely reproduced. Therefore, defendants are not liable for copying and transcribing the tapes.

 However, the summary judgment evidence is replete with examples of how the media defendants used the contents of the tapes in other ways. They analyzed the tapes and compiled relevant portions to be transcribed. (WFAA Exh. F ¶¶ 12, 19). Riggs and Ward made notes and developed leads based on the substance of the intercepted conversations. (Plf. Exh. H at 611, 515–20; Plf. Exh. J at 110–11, 119–25, 157, 1176, 182, 242; WFAA Exh. D ¶¶ 15–20; WFAA Exh. F ¶¶ 12, 16–18). Ultimately, the tapes formed the basis for the broadcasts themselves.[17] The Court concludes that the media defendants actively employed the tapes to further their investigation of Peavy and Oliver. This constitutes "use" within the meaning of Title III.

17. The media defendants argue that their subsequent actions dissipated the taint of any initial illegality. They point out that the tapes were not played over the air and independent sources were developed for every fact reported. This argument is based on a recognized exception to the exclusionary rule known as the attenuation doctrine. *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307 (1939); *United States v. Sheppard*, 901 F.2d 1230, 1234 (5th Cir.1990). However, the exclusionary rule does not excuse a substantive violation of the law.

## D. *Disclosure*

 Title III also prohibits the intentional disclosure of the contents of an illegally intercepted communication.[18] 18 U.S.C. § 2511(1)(c). "Disclose" means "[t]o bring into view by uncovering; to expose; to make known; to lay bare; to reveal to knowledge; to free from secrecy or ignorance, or make known." BLACK'S LAW DICTIONARY 464. A communication is disclosed every time it is played to a third party who has not yet heard it. *Fultz v. Gilliam*, 942 F.2d 396, 402 (6th Cir.1991). However, a defendant "need not play the tapes or repeat the conversations to be liable." *Deal v. Spears*, 980 F.2d 1153, 1158 (8th Cir.1992). Title III prevents the disclosure of *"any information* concerning the substance, purport, or meaning" of the communications. *See* 18 U.S.C. § 2510(8) (emphasis added). Therefore, even revealing the general nature of a communication or intimating its contents may constitute an actionable disclosure. *See Deal*, 980 F.2d at 1156.

 The media defendants argue there was no disclosure because they did not play, refer to, or summarize the tapes in their broadcasts. However, the broadcasts revealed that Peavy and Oliver were involved in a plan to split commissions on insurance contracts. This information was initially derived from the tapes. Therefore, the media defendants disclosed the "substance, purport, and meaning" of the illegally intercepted communications. The fact that Riggs later obtained the same information from independent sources is irrelevant. *See supra* n. 17.

Whether or not the media defendants used other sources to develop their story, they also used the illegal tapes.

18. The Texas Wiretap Act uses the term "divulge" instead of "disclose." TEX.CIV.PRAC. & REM.CODE ANN. § 123.002(a)(2). "Divulge" means "[t]o disclose or make known." BLACK'S LAW DICTIONARY 480. The Court therefore concludes that the same conduct is prohibited under both state and federal law.

■ Nor are the broadcasts themselves the only evidence of actionable disclosures shown in the record. It is undisputed that Charles Harman sent copies of 18 different tapes to Riggs with the intent and knowledge that he would play them. Riggs disclosed the contents of the tapes to P.J. Ward, who selected relevant portions and had them transcribed by a court reporter. Copies of the transcripts were furnished to John Miller and Paul Watler. Riggs and Harman also revealed the contents of the tapes to several law enforcement officials. Harman gave copies of the tapes to District Attorney John Vance, Detective Kevin Navarro, and FBI Agent Mark Chapman. All these actions constitute disclosures under Title III.

■ However, the Court cannot conclude as a matter of law that the Harmans are liable for disclosure of the "Race Tape" played at the DISD board meeting on September 28, 1995. Plaintiffs have introduced some evidence that suggests the Harmans sent this tape to three members of the Dallas school board. Portions of the Race Tape are identical to a tape the Harmans made for Riggs. In addition, plaintiffs allege that the type-face on a transcript created by Wilma Harman matches that found on notes that were included with the Race Tape.[19] However, this evidence alone will not support a summary judgment. The record also shows that WFAA, the Dallas County District Attorney, and the FBI all had copies of portions of the Race Tape at the time it was sent to school board members.[20] Moreover, the Harmans vehemently deny that they created or delivered the tape. This genuine issue of material fact precludes summary judgment in favor of either party. *See Leonard v. Dixie Well Service & Supply, Inc.*, 828 F.2d 291, 294

(5th Cir.1987) (credibility determinations cannot be resolved on summary judgment).

In sum, the Court finds that the media defendants used and disclosed the contents of illegally intercepted communications. The Harmans intercepted those communications and disclosed their contents. However, defendants have raised various affirmative defenses in an attempt to escape liability under Title III and Texas Wiretap Act. The Court addresses those arguments next.

## VI.

### *DEFENSES*

The media defendants challenge the application of Title III and the Texas Wiretap Act on constitutional grounds. They argue that: (1) the First Amendment protects their right to receive, use, and publish truthful information about matters of public significance; (2) any restrictions on routine newsgathering and broadcast activities would operate as a prior restraint; and (3) the state and federal wiretap statutes are unconstitutionally vague and overbroad. The Harmans also raise several defenses. They contend that: (1) their illegal activities were compelled by necessity; (2) the intercepted communications did not affect interstate commerce; (3) Title III requires proof of a prior criminal conviction before civil liability attaches; and (4) the Texas Wiretap Act does not apply to cordless telephone calls.

### A. *First Amendment Issues*

This case presents a classic conflict between the right to privacy and the right of a free press to publish truthful and newsworthy information. Both rights are plainly rooted in tradition and serve significant government interests. *See Cox*

---

19. Plaintiffs further argue that the FBI concluded that the handwriting on the delivery ticket matched Wilma Harman's. This overstates the evidence. The FBI report raises this possibility. However, "[a] definitive determination could not be reached due to the absence of sufficiently comparable known

writing and due to unexplained variation not found on the basis of the available known writing." (Plf. Exh. NN-2 at P000049).

20. Plaintiffs do not contend that the media defendants disseminated the Race Tape.

*Broadcasting Corp. v. Cohn*, 420 U.S. 469, 491, 95 S.Ct. 1029, 1044, 43 L.Ed.2d 328 (1975). For this reason, resolution of conflicts between these rights must "rely[ ] on limited principles that sweep no more broadly than the appropriate context of the instant case." *The Florida Star v. B.J.F.*, 491 U.S. 524, 533, 109 S.Ct. 2603, 2609, 105 L.Ed.2d 443 (1989). This fact-intensive analysis is guided by three considerations: (1) whether the media lawfully obtained truthful information about a matter of public significance; (2) whether the imposition of liability is necessary to further a state interest of the highest order; and (3) whether punishing the media for publishing truthful information would result in "timidity and self-censorship." *Id.* at 2609–10, *citing Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 103, 99 S.Ct. 2667, 2671, 61 L.Ed.2d 399 (1979) *andCox Broadcasting*, 95 S.Ct. at 1046–47; *see also Peavy v. New Times, Inc.*, 976 F.Supp. 532, 538 (N.D.Tex.1997). The Court finds that these considerations must be resolved in favor of the media defendants in this case. Accordingly, Title III and the Texas Wiretap Act are unconstitutional as applied.

### 1.

The first question is whether the media defendants lawfully obtained truthful information about a matter of public significance. Plaintiffs concede that the information provided to Riggs and WFAA was truthful. The Court will therefore consider whether that information was lawfully obtained and concerned a matter of public significance.

### a.

The Court has already found that the Harmans illegally intercepted and taped plaintiffs' private telephone conversations. Copies of the tapes were provided to WFAA and Riggs. Plaintiffs argue that this precludes a determination that the media defendants "lawfully obtained" the information contained on the tapes. This appears to be an issue of first impression. No court has ever addressed whether the

government may punish a media defendant for publishing truthful information that has been unlawfully acquired by a source. That issue was specifically reserved by the Supreme Court in *Florida Star*, but is squarely presented here. *See Florida Star*, 109 S.Ct. at 2610 n. 8.

The First Amendment does not give the media license to violate the law. *See Cohen v. Cowles Media Co.*, 501 U.S. 663, 669, 111 S.Ct. 2513, 2518, 115 L.Ed.2d 586 (1991). More specifically, "media defendants do not have a privilege to place unlawful wiretaps." *Boddie v. American Broadcasting Cos.*, 881 F.2d 267, 271 (6th Cir.1989), *cert. denied*, 493 U.S. 1028, 110 S.Ct. 737, 107 L.Ed.2d 755 (1990). It is beyond question that the First Amendment would not protect the media defendants from liability had they violated the interception or procurement prongs of Title III. However, such is not the case here. The question is whether the First Amendment protects the media defendants in publishing truthful information acquired by *the Harmans* in violation of the federal and state wiretap statutes. The Court concludes that it does.

As previously discussed, the media defendants did not seek out the Harmans or induce them to intercept the communications. The Harmans contacted WFAA with a story that was potentially newsworthy. Receiving, investigating, and reporting on tips from such sources is a routine newsgathering technique. *See Pell v. Procunier*, 417 U.S. 817, 834, 94 S.Ct. 2800, 2810, 41 L.Ed.2d 495 (1974) ("[A] journalist is free to seek out sources of information ... and ... government cannot restrain the publication of news emanating from such sources."). These types of activities are protected by the First Amendment. *Daily Mail*, 99 S.Ct. at 2671. Plaintiffs argue that the media should never be allowed to accept information obtained by a private party through an illegal wiretap. However, it is not incumbent upon the media to determine

whether information provided by a source has been derived through legal means. This would create an undue burden and hardship on the media and impede its ability to disseminate newsworthy information in a timely fashion. As long as a media defendant does not personally intercept a protected communication or procure another do so, any information acquired through legitimate newsgathering techniques is "lawfully obtained." [21]

### b.

The next issue is whether the information involved a matter of public significance. Peavy was an elected member of the Dallas school board and appointed Oliver as the exclusive agent to obtain insurance on behalf of the district. The contents of the intercepted communications suggest an arrangement between Peavy and Oliver to split commissions on insurance policies sold to DISD. Clearly, this kickback scheme is a matter of great public significance.

Plaintiffs argue that the contents of private telephone conversations can never be a matter of public significance. At least one state court has suggested that a media defendant may be liable for publishing purely private information. *Natoli v. Sullivan,* 159 Misc.2d 681, 606 N.Y.S.2d 504 (Sup.Ct.1993), *aff'd,* 206 A.D.2d 841, 616 N.Y.S.2d 318 (App.Div.1994). However, this begs the question presented here. The issue is whether the media can publish the contents of private communications that concern matters of public importance. *Natoli* provides little guidance on this issue. Indeed, the Supreme Court has admonished lower courts to decide each case on its own facts. *Florida Star,* 109 S.Ct. at 2609 ("We continue to believe that the sensitivity and significance of the interests presented in clashes between First Amendment and privacy rights counsel relying on limited principles that sweep no more broadly than the appropriate context of the instant case."). The facts of this case show that the information provided to the media defendants involved matters of public significance.

### 2.

The second question is whether the imposition of liability is necessary to further a state interest "of the highest order." *Id.* at 2611. Certainly, privacy is such an interest. *Id.* at 2609. However, the privacy interest asserted in this case is not the constitutional right of privacy—that is "the right to be let alone" from *government* intrusion into personal and intimate decisions and beliefs. *See generally Carey v. Population Services International,* 431 U.S. 678, 684–85, 97 S.Ct. 2010, 2016, 52 L.Ed.2d 675 (1977) (citing cases). Rather, the privacy right implicated here arises under the federal and state wiretap laws.

While such statutory rights are certainly important, they fare poorly against the constitutional rights of a free and unfettered press. *See, e.g. Florida Star,* 109 S.Ct. at 2611 (privacy of victims of sexual offenses); *Daily Mail,* 99 S.Ct. at 2671 (anonymity of juvenile offenders). The privacy rights protected under Title III and the Texas Wiretap Act are no more compelling than those of rape victims or juvenile offenders. In fact, another judge in this district has found that the statutory right of privacy under Title III is not sufficiently compelling to warrant infringing on the constitutional right of the media to publish matters of public significance. *Peavy,* 976 F.Supp. at 539 (Buchmeyer, C.J.). This Court agrees with that conclusion. The imposition of liability on the media defendants is not necessary to protect a state interest of the "highest order."

---

**21.** Plaintiffs further argue that the information was not "lawfully obtained" because the media defendants used and disclosed the intercepted communications in violation of Title III. This misses the mark. The focus is on how the information was *obtained,* not what was done with it thereafter. *See Florida Star,* 109 S.Ct. at 2609, 2611; *Peavy,* 976 F.Supp. at 538.

**3.**

The third and final consideration is whether punishing the media defendants for publishing the information will result in "timidity and self-censorship." *Florida Star*, 109 S.Ct. at 2610. The answer in the context of this particular case is obvious. The Harmans provided the media defendants with tapes of intercepted telephone calls that contained evidence of possible corruption by Dan Peavy. The Court has already determined that these tapes were lawfully obtained by the media defendants and concerned matters of great public interest. *See* Part VI–A(1). Significantly, the tapes were not played over the air or referred to in broadcasts. The media defendants even attempted to determine whether the interceptions were legal. Their actions were consistent with those of a responsible journalist—to investigate leads, verify facts, and publish newsworthy information. To require anything more would undoubtedly result in "timidity and self-censorship." *See Florida Star*, 109 S.Ct. at 2612 (courts should be reluctant to punish the use of routine newsgathering techniques).

The Court concludes that the First Amendment prohibits the imposition of liability against the media defendants under the use and disclosure prongs of Title III and the Texas Wiretap Act.[22] Their motion for summary judgment should be granted on this ground.

## B. *Necessity*

■■■ The Harmans claim that they were compelled by necessity to violate the law because Peavy threatened to harm them. "[T]he defense of necessity, or choice of evils, traditionally covered situations where physical forces beyond the actor's control rendered illegal conduct the lesser of two evils." *United States v. Bailey*, 444 U.S. 394, 410, 100 S.Ct. 624, 634, 62 L.Ed.2d 575 (1980). In order to prove this defense, the Harmans must establish: (1) that they were under an unlawful and present, imminent, or impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury; (2) that they did not recklessly or negligently place themselves in a situation where they would be forced to chose the criminal conduct; (3) that they had no reasonable legal alternative to violating the law; and (4) a direct causal relationship between the criminal action taken and avoidance of the harm. *United States v. Willis*, 38 F.3d 170, 175 (5th Cir.1994), *cert. denied*, 515 U.S. 1145, 115 S.Ct. 2585, 132 L.Ed.2d 834 (1995).[23] These elements must be assessed under an objective rather than a subjective standard. *Id.*

■■■ The Harmans have failed to meet their burden of proof on at least two essential elements of this defense. The threats they overheard, although perhaps frightening, were not present, immediate, and impending. *See United States v. Stevens*, 985 F.2d 1175, 1182 (2d Cir.1993) (generalized fear not tied to an immediate threat of harm does not implicate necessity defense); *United States v. Tanner*, 941 F.2d 574, 587 (7th Cir.1991), *cert. denied*, 502 U.S. 1102, 112 S.Ct. 1190, 117 L.Ed.2d 432 (1992) (fear alone is insufficient to establish defense of necessity). There is no indication that Peavy had a present or immediate intention to carry out any of the fanciful schemes he discussed with his neighbors. Moreover, the threats were not communicated directly to the Harmans or anyone in privity with them. *See United States v. Gordon*, 526 F.2d 406, 408 (9th

---

**22.** This constitutional protection also extends to any internal uses or disclosures of the intercepted communications. The right to publish truthful information on matters of public significance would be meaningless if the media were not allowed to determine whether the information it seeks to publish is in fact truthful.

**23.** *Willis* involved the defense of duress. However, the same elements are required to establish a necessity defense. *See Bailey*, 100 S.Ct. at 634.

Cir.1975) (threats communicated by telephone do not satisfy immediacy requirement).

█ Nor have the Harmans established that they had no reasonable legal alternative to violating the law. The defense of necessity is reserved for cases of real emergency. *See United States v. Lewis,* 628 F.2d 1276, 1279 (10th Cir.1980), *cert. denied,* 450 U.S. 924, 101 S.Ct. 1375, 67 L.Ed.2d 353 (1981). It is not available unless "[t]here is no time for a complaint to the authorities or there exists a history of futile complaints which make any result from such complaints illusory." *United States v. Boomer,* 571 F.2d 543, 545 (10th Cir.), *cert. denied,* 436 U.S. 911, 98 S.Ct. 2250, 56 L.Ed.2d 411 (1978). The evidence plainly shows that the Harmans had both the time and opportunity to contact the authorities. Their limited attempts to involve law enforcement officials do not prove that any further complaints would have been futile. Although the Harmans subjectively believed that law enforcement authorities were giving them the "run around," no *reasonable* person confronted with similar threats would have abandoned attempts to get the police involved after making a single report. *See United States v. Rawlings,* 982 F.2d 590, 593 (D.C.Cir. 1993) (defendant cannot claim defense if he passed up opportunity to seek aid of law enforcement); *United States v. Laetividal–Gonzalez,* 939 F.2d 1455, 1465 (11th Cir.1991), *cert. denied,* 503 U.S. 912, 112 S.Ct. 1280, 117 L.Ed.2d 505 (1992) (same). This defense fails as a matter of law.

### C. *Nexus to Interstate Commerce*

█ The Harmans further contend that the intercepted communications involved telephone calls between local residents and therefore did not affect interstate commerce. This argument presumes that a nexus to interstate commerce is an essential element of a Title III claim. It is

not. The elements of a violation are contained in 18 U.S.C. § 2511(1). In contrast, the nexus requirement is set forth in 18 U.S.C. § 2510(1). This section defines a "wire communication" as one made by "wire, cable, or other like connection ... furnished or operated by any person engaged in providing or operating such *facilities for the transmission of interstate or foreign commerce or communications affecting interstate or foreign commerce.*" *Id.* § 2510(1) (emphases added). Given its placement in the text of the statute, it seems more likely that the reference to interstate commerce was merely an expression of Congress's power to regulate the matters covered by Title III.

█ Moreover, the federal wiretap statute also applies to communications carried by "facilities for the transmission of interstate or foreign commerce." *Id.* § 2510(1). The telephone is indisputably an instrumentality of interstate commerce. *See United States v. Clayton,* 108 F.3d 1114, 1117 (9th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 233, 139 L.Ed.2d 165 (1997); *Kratz,* 477 F.Supp. at 475. As such, it is subject to federal regulation even when used purely for intrastate purposes. *See Dupuy v. Dupuy,* 511 F.2d 641, 643–44 (5th Cir.1975) (intrastate use of telephone confers federal jurisdiction over private cause of action under Section 10 of the Securities and Exchange Act); *Aquionics Acceptance Corp. v. Kollar,* 503 F.2d 1225, 1228 (6th Cir.1974) (same). This argument is without merit.

### D. *Prior Criminal Conviction*

█ The Harmans also maintain that Title III requires proof of a prior criminal conviction before civil liability attaches.[24] They base this theory on an overly generous reading of the statute. Section 2520(a) provides that "any person whose wire, oral, or electronic communication is inter-

---

24. Charles Harman conveniently ignores the fact that he pled guilty to one count of unlaw-

ful interception and paid a $5,000 fine.

cepted, disclosed, or intentionally used *in violation of this chapter* may in a civil action recover from the person or entity which engaged in that violation such relief as may be appropriate." 18 U.S.C. § 2520(a) (emphasis supplied). This necessarily requires proof of a criminal *violation. See Kratz*, 477 F.Supp. at 483 ("[N]o cause of action arises under Title III unless the criminal provisions of the statute have been violated."). However, civil liability is not predicated on proof of a criminal *conviction.* Indeed, Congress has rejected such an interpretation of Title III:

> The plaintiff may bring a civil action under section 2520 whether or not the defendant has been subject to a criminal prosecution for the acts complained of, but in the absence of such prosecution and conviction, it is the plaintiff's burden to establish that the requirements of the section are met.

1986 U.S.C.C.A.N. at 3581. This argument is without merit.

### E. *Texas Wiretap Act Defense*

 Finally, the Harmans contend that the Texas Wiretap Act does not apply to cordless telephones. They cite to a provision in the Texas Code of Criminal Procedure that applies to wiretap orders obtained by state law enforcement personnel. *See* Tex.Code Crim.Proc.Ann. art. 18.20 (Vernon Supp.1997). The definition of "wire communications" under this statute specifically excludes the radio portion of cordless telephone communications. *Id.* at § 1(1). Therefore, the Harmans reason that their conduct is not actionable under the Texas Wiretap Act.

The Court has found no authority to support this novel argument. The Texas Wiretap Act broadly prohibits the interception, use, or disclosure of any communication "transmitted in whole or in part with the aid of a wire or cable." Tex.Civ. Prac. & Rem.Code Ann. § 123.001(1). Communications intercepted from cordless telephones are not excluded under the Act. The definitions contained in the civil stat-

ute control notwithstanding the provisions of the Texas Code of Criminal Procedure.

In sum, none of the defenses raised by the Harmans defeat plaintiffs' claims under Title III or the Texas Wiretap Act. Plaintiffs' motion for summary judgment should be granted and the Harmans' motion should be denied.

### VII.

### *COMMON LAW CLAIMS*

Plaintiffs assert claims against all defendants for invasion of privacy, intentional infliction of emotional distress, and civil conspiracy. In addition, Eugene Oliver has sued the media defendants for tortious interference with contractual relations. The parties have filed cross-motions for summary judgment as to these common law claims.

#### A. *Invasion of Privacy*

Plaintiffs allege two distinct violations of their right to privacy. First, they maintain that all defendants intruded upon their seclusion, solitude, or private affairs. (Peavy WFAA Complaint ¶ 7; Peavy Harman Complaint ¶ 5; Oliver Complaint ¶ 7). Second, plaintiffs assert that the media defendants publically disclosed embarrassing facts about them. (Peavy WFAA Complaint ¶ 6; Oliver Complaint ¶ 8). The Court will address each aspect of the privacy claims separately.

1.

 A plaintiff may recover for invasion of privacy by intrusion if he proves that: (1) the defendant intentionally intruded, physically or otherwise, upon his solitude, seclusion, private affairs, or concerns; and (2) the intrusion would be highly offensive to a reasonable person. Restatement (Second) of Torts § 652B (1976); *Valenzuela v. Aquino*, 853 S.W.2d 512, 513 (Tex.1993). The intrusion element requires a positive act by the defendant, other than publication, that encroaches on the plaintiff's seclusion. *Reuber v. Food Chemical News, Inc.*, 925

F.2d 703, 718–19 (4th Cir.), *cert. denied,* 501 U.S. 1212, 111 S.Ct. 2814, 115 L.Ed.2d 986 (1991). A media defendant is not liable for merely receiving information that has been tortiously obtained by another, even if it has knowledge of the impropriety. *See McNally v. Pulitzer Publishing Co.,* 532 F.2d 69, 79 n. 14 (8th Cir.), *cert. denied,* 429 U.S. 855, 97 S.Ct. 150, 50 L.Ed.2d 131 (1976); *Pearson v. Dodd,* 410 F.2d 701, 705 (D.C.Cir.), *cert. denied* 395 U.S. 947, 89 S.Ct. 2021, 23 L.Ed.2d 465 (1969).

### a.

■■■ The Harmans first contend that their intrusion was not "willful" because they relied in good faith on the advice of law enforcement officials. They cite several Texas cases for the proposition that an invasion of privacy must be "willful" or done with "conscious disregard for the rights of others." *See, e.g. Closs v. Goose Creek Consolidated Independent School District,* 874 S.W.2d 859, 870 (Tex.App.— Texarkana 1994, no writ). The terms "willful" and "intentional" are often used synonymously in tort law. *See Closs,* 874 S.W.2d at 871. Thus, plaintiffs need only prove that the Harmans desired the consequences of their actions or reasonably believed that such consequences were likely to result therefrom. *See* Part V–A(1). There is no question that the Harmans intended to intercept and tape plaintiffs' private telephone conversations. Whether they believed their actions were legal is irrelevant.

■■■ The Harmans further argue that their conduct was not "unwarranted." They cite threats made by Peavy to remove them from the neighborhood and evidence of public corruption to justify their illegal wiretap activities. Although some courts have noted that an actionable intrusion must be "unwarranted," no reported decision has addressed this requirement in any detail. *See, e.g. Carr v. Mobile Video Tapes, Inc.,* 893 S.W.2d 613, 622 (Tex.App.—Corpus Christi 1994, no writ),

*citing Billings v. Atkinson,* 489 S.W.2d 858, 859–60 (Tex.1973) (invasion of privacy must be "substantial" and "unwarranted"). The Court therefore questions the legal significance of this aspect of an intrusion claim. Nevertheless, the summary judgment evidence establishes that the Harmans' actions were "unwarranted" as a matter of law. Petty disputes between neighbors do not justify the interception of private telephone calls. Nor does the revelation of an illegal insurance kickback scheme between Peavy and Oliver excuse this intrusion. Although the Harmans paint themselves as "concerned citizens," their actions were nothing short of vigilantism motivated by self-interest. The Court is unwilling to condone such conduct. Accordingly, the Harmans are not entitled to summary judgment on the intrusion claim.

Plaintiffs, on the other hand, are entitled to summary judgment against the Harmans. Eavesdropping is the quintessential example of a highly offensive intrusion upon seclusion. The tort is defined as "a physical invasion of a person's property *or by eavesdropping on another's conversation with the aid of wiretaps,* microphones, or spying." *Gill v. Snow,* 644 S.W.2d 222, 224 (Tex.App.—Fort Worth 1982, no writ) (emphasis added); *see also Billings,* 489 S.W.2d at 860; RESTATEMENT (SECOND) OF TORTS § 652B, cmt. b. The Harmans listened to plaintiffs' telephone conversations for several months with the aid of a police scanner. This constitutes intrusion as a matter of law.

### b.

■■■ Plaintiffs contend that the media defendants are liable for intrusion because they encouraged the interceptions and accepted the fruits of this illegal activity. However, the Court has held that there is no evidence of active participation on the part of the media defendants. *See* Part V–B. Harman told Riggs that he planned to record future telephone calls and offered to provide him copies of the tapes. Riggs accepted the offer. He also asked Har-

man to leave the recorder running throughout the entire conversation and not to edit the tapes so their authenticity could not be questioned. This benign suggestion does not amount to "a positive act by the [media] defendants ... that encroaches on the plaintiffs' seclusion." *Reuber*, 925 F.2d at 718. The media defendants are entitled to summary judgment on the intrusion claim.

### 2.

■ Plaintiffs further allege that the media defendants publically disclosed embarrassing facts about them. In order to prove this claim, plaintiffs must establish that: (1) the publicized information contains highly intimate or embarrassing facts about their private affairs; (2) the publication of this information would be highly objectionable to a reasonable person; (3) the information was communicated to the public at large; and (4) the information was not a matter of legitimate concern to the public. *Johnson v. Sawyer*, 47 F.3d 716, 723 (5th Cir.1995); *Industrial Foundation of the South v. Texas Industrial Accident Board*, 540 S.W.2d 668, 683–85 (Tex.1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1550, 51 L.Ed.2d 774 (1977).

■ The corruption of a local school board official undoubtedly is a matter of legitimate public concern. *See Wallace v. Texas Tech University*, 80 F.3d 1042, 1050–51 (5th Cir.1996); *Conaway v. Smith*, 853 F.2d 789, 796 (10th Cir.1988). However, plaintiffs believe that information obtained in violation of the federal wiretap statute necessarily negates any public interest. The Court disagrees. Title III and the tort of disclosure focus on different types of conduct. Title III broadly prohibits the dissemination of information obtained in violation of the wiretap laws regardless of content. Conversely, tort liability is predicated on the content of the disclosure regardless of how the information is obtained. *See McNally*, 532 F.2d at 79. Title III does not transform every violation of the statute into an actionable

state law claim for public disclosure of private facts. *See Johnson*, 47 F.3d at 734–36 (rejecting argument that disclosure of information made confidential by tax laws is *per se* private, intimate, and embarrassing). "This requirement is necessarily one which can only be considered in the context of each particular case, considering the nature of the information and the public's legitimate interest in its disclosure." *Industrial Foundation*, 540 S.W.2d at 685. Clearly, the public had a right to know whether Peavy and Oliver agreed to split commissions on insurance policies sold to DISD. The Court concludes that the media defendants are entitled to summary judgment on this claim.

### B. *Intentional Infliction of Emotional Distress*

■ Plaintiffs have sued all defendants for intentional infliction of emotional distress. (Peavy WFAA Complaint ¶ 8; Peavy Harman Complaint ¶ 7; Oliver Complaint ¶ 10). Texas law recognizes such a claim where: (1) defendants acted intentionally or recklessly; (2) their conduct was extreme and outrageous; and (3) plaintiffs suffered severe emotional distress as a result of that behavior. *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex.1993); RESTATEMENT (SECOND) OF TORTS § 46 (1965). Defendants argue that plaintiffs cannot establish these elements. In addition, the media defendants contend that this claim is barred on constitutional grounds.

### 1.

■ Defendants first argue that their conduct was not "extreme or outrageous." This element is established "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Twyman*, 855 S.W.2d at 621, *quoting* RESTATEMENT (SECOND) OF TORTS § 46, cmt. d. Illegal wiretap activities may satisfy this

requirement. *See Scutieri v. Estate of Revitz,* 683 F.Supp. 795, 802 (S.D.Fla. 1988). *But cf. Harriston v. Chicago Tribune Co.,* 992 F.2d 697, 703 (7th Cir. 1993) (conduct of employer who monitored workplace phone calls not extreme and outrageous). However, the Court need not resolve this issue because none of the plaintiffs have established that their emotional distress was "severe."

■ Texas law requires a proof of emotional distress so severe that no reasonable person could be expected to endure it without experiencing unreasonable suffering. RESTATEMENT (SECOND) OF TORTS § 46, cmt. j; *American Medical International, Inc. v. Giurintano,* 821 S.W.2d 331, 341 (Tex.App.—Houston [14th Dist.] 1991, no writ). Plaintiffs must show more than "mere worry, anxiety, vexation, embarrassment, or anger." *See Parkway Co. v. Woodruff,* 901 S.W.2d 434, 444 (Tex.1995). The evidence adduced by plaintiffs fails to meet this standard. Anna Oliver testified that she cried a lot and experienced nightmares and insomnia. (Plf.Exh. P ¶ 2). Sally Peavy had nightmares, lost friends, and suffered from anxiety and embarrassment. (Plf.Exh. N ¶ 2). Eugene Oliver developed stomach cramps and headaches, and became worried and anxious when out in public. (Plf.Exh. O ¶ 2). Dan Peavy experienced headaches, depression, anxiety, and fatigue. (Plf.Exh. M ¶ 2). Both Oliver and Peavy claimed they had trouble sleeping and became short-tempered. (Plf.Exh. O ¶ 2; Plf.Exh. M ¶ 2). This does not constitute "severe emotional distress" as a matter of law. *See, e.g. McCray v. DPC Industries, Inc.,* 875 F.Supp. 384, 393 (E.D.Tex.1995) (insomnia, anxiety, and fright); *Badgett v. Northwestern Resources Co.,* 818 F.Supp. 998, 1004 (W.D.Tex.1993) (worry, negative attitude, intermittent headaches, and depression). *Cf. Wilson v. Monarch Paper Co.,* 939 F.2d 1138, 1141 (5th Cir.1991) (emotional dis-

tress sufficiently severe where plaintiff became suicidal); *Motsenbocker v. Potts,* 863 S.W.2d 126, 135 (Tex.App.—Dallas 1993, no writ) (same). It is also significant that plaintiffs were not required to seek help from a mental health professional. This further militates against a finding of "severe emotional distress." *See McCray,* 875 F.Supp. at 393; *Villasenor v. Villasenor,* 911 S.W.2d 411, 417 (Tex.App.—San Antonio 1995, no writ); *Benavides v. Moore,* 848 S.W.2d 190, 196 (Tex.App.—Corpus Christi 1992, writ denied). Defendants are entitled to summary judgment on this claim.

### 2.

■ The media defendants further contend that this claim is precluded by the First Amendment and *Hustler Magazine v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988). In *Falwell,* the Supreme Court held that public officials and public figures may not recover for intentional infliction of emotional distress by reason of publication "without showing in addition that the publication contains a false statement of fact which was made with 'actual malice' . . ." *Falwell,* 108 S.Ct. at 882. Dan Peavy was a public official by virtue of his position as an elected member of the Dallas school board. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 344, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974) ("An individual who decides to seek governmental office must accept certain necessary consequences of that involvement in public affairs."). Eugene Oliver became a public figure when he agreed to split commissions with Peavy on insurance policies sold to DISD.[25] *See Gertz,* 94 S.Ct. at 3012. Plaintiffs concede that the information published about them was true.

Plaintiffs attempt to side-step these constitutional limitations by arguing that it was extreme and outrageous for the media defendants to *investigate* their activities

---

**25.** Sally Peavy and Anna Oliver are not public figures or public officials. However, their intentional infliction of emotional distress

claims are based entirely on the publication of damaging information about their husbands.

based on the contents of illegally intercepted telephone calls. However, it is clear that any damages sustained by plaintiffs resulted from the *publication* of this information. *Falwell* precludes an intentional infliction of emotional distress claim against the media defendants.

### C. *Tortious Interference*

Eugene Oliver alleges that the media defendants disparaged his name and reputation "privately and in a series of television broadcasts." (Oliver Complaint ¶ 14). As a result, Washington National Insurance Company stopped commission payments on disability income insurance policies sold to DISD and Mary Kay Cosmetics refused to consummate a contract for cancer insurance. Oliver has sued for tortious interference with contractual relations. (Oliver Complaint ¶¶ 12–14). The media defendants contend that this claim is barred by limitations.

■■■ A tortious interference claim based on disparaging or defamatory statements about a plaintiff is treated as a defamation action. *See KTRK Television v. Felder*, 950 S.W.2d 100, 108 (Tex.App.— Houston [14th Dist.] 1997, no writ). Such claims are governed by a one-year statute of limitations. *Laird v. Texaco, Inc.*, 722 S.W.2d 519, 521 (Tex.App.—Beaumont 1986, no writ); *Moore & Associates v. Metropolitan Life Insurance Co.*, 604 S.W.2d 487, 491 (Tex.Civ.App.—Dallas 1980, no writ). The statute begins to run from the date the disparaging words are spoken or published. *Laird*, 722 S.W.2d at 521–22. The media defendants broadcast their report in July and August of 1995. However, Oliver did not file this lawsuit until December 30, 1996. His tortious interference claim is clearly barred by limitations.

### D. *Conspiracy*

■■■ Plaintiffs allege that the defendants conspired to violate their rights under the federal wiretap statute and common law. (Peavy WFAA Complaint ¶ 7;

Peavy Harman Complaint ¶ 6; Oliver Complaint ¶¶ 9, 15). A civil conspiracy is "a combination of two or more persons to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Triplex Communications, Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex.1995). An actionable conspiracy consists of: (1) two or more persons; (2) an objective to be accomplished; (3) a meeting of the minds on the objective; (4) one or more overt acts; and (5) damages as a proximate result of the conduct. *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex.1983). Each participant in a conspiracy must have the specific intent to injure the plaintiff. *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 856 (Tex.1968). Thus, the crux of a civil conspiracy is the harm intended rather than the agreement itself. *Firestone Steel Products Co. v. Barajas*, 927 S.W.2d 608, 614 (Tex.1996). Merely proving a joint intent to engage in conduct that resulted in injury is not sufficient. *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex.1996).

■■ The Court initially observes that plaintiffs have failed to establish any of their claims against the media defendants. This does not necessarily preclude a conspiracy finding. A defendant is liable for conspiracy if he "participated" in an underlying tort for which the plaintiff seeks to hold at least one defendant liable. *Tompkins v. Cyr*, 995 F.Supp. 664, 685 (N.D.Tex.1998); *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex.1996). "Participation" includes planning, assistance, or encouragement of another's unlawful acts. *Tompkins*, 995 F.Supp. at 685; *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 926 (Tex.1979).

■■ Nevertheless, the Court finds no evidence of a civil conspiracy. Defendants honestly believed that their wiretap activities were lawful. They relied in good faith on the advice of law enforcement officials and legal counsel. If defendants did not know their actions were illegal, they could not have any specific intent to "accomplish

an unlawful purpose or to accomplish a lawful purpose by unlawful means." *See Juhl,* 936 S.W.2d at 644. One cannot conspire to commit a wrong about which he has no knowledge. *Schlumberger Well Surveying,* 435 S.W.2d at 857. Plaintiffs argue that reliance on the advice of others is irrelevant. While this may be true in the context of their other claims, defendants' good faith belief that their conduct was legal is dispositive of the conspiracy allegations. Defendants are entitled to judgment as a matter of law on this claim.

### E. *Damages*

Finally, the Harmans contend that plaintiffs have failed to prove damages as a result of their illegal wiretap activities and tortious conduct. This argument borders on frivolous. Plaintiffs are entitled to statutory and actual damages under both Title III and the Texas Wiretap Act.[26] *See* 18 U.S.C. § 2520(c)(2); Tex.Civ.Prac. & Rem Code.Ann. § 123.004. In addition, plaintiffs can recover any damages proximately caused by the invasion of their privacy. These damage issues should be deferred until trial. The Harmans are not entitled to summary judgment on this ground.

### RECOMMENDATION

The cross-motions for summary judgment should be granted in part and denied in part. Plaintiffs are entitled to judgment as a matter of law on their claims against the Harmans for violations of Title III and the Texas Wiretap Act and for invasion of privacy by intrusion. All defendants are entitled to judgment as a matter of law on plaintiffs' common law claims for public

disclosure of private facts, intentional infliction of emotional distress, tortious interference with contractual relations, and civil conspiracy. The media defendants are entitled to judgment as a matter of law on their affirmative defense that Title III and the Texas Wiretap Act are unconstitutional as applied to them.

All claims against the media defendants should be dismissed with prejudice. These cases should proceed to trial on the issue of damages and whether the Harmans intentionally disclosed the contents of the "Race Tape" in violation of Title III and the Texas Wiretap Act.

---

**26.** Title III provides that "the court may assess as damages whichever is the greater of—
 (a) the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or
 (b) statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000.
18 U.S.C. § 2520(c)(2). The Texas Wiretap Act provides that "[a] person who establishes a cause of action under this chapter is entitled to . . .

 (2) statutory damages of $1,000; [and]
 (3) all actual damages in excess of $1,000 . . ."
Tex.Civ.Prac. & Rem.Code Ann. § 123.004. Both statutes also provide for injunctive relief, reasonable attorney's fees, and punitive damages in appropriate cases. 18 U.S.C. § 2520(b)(1)– (3); Tex.Civ.Prac. & Rem.Code Ann. § 123.004(1), (4) & (5).